Loring, J.,
delivered the opinion of the court:
The statement of facts shows that the petitioner was paid $6,166.53, as half of the pay and allowances of a first lieutenant of marines, from the 21st June, 1866, the date of the order dismissing him from the service, to the 10th July, 1873, the date of the order made to revoke his dismissal. And in this suit he alleges that he was, for the term of time specified, entitled to full pay and allowances, and claims as the residue of these about $7,000.
By the Constitution, the President is to appoint officers by and with the advice of the Senate; and under that provision he can remove officers only in the same way — that is, by and with the advice of the Senate — for the rule and maxim of law is that the power to remove is incident to the power to appoint; “ on jus est instiiuere, ejus est abrogare.”
But in 1789, when bills for the organization of the Executive Departments were before Congress, it was claimed that the power to remove officers was, from its nature, an attribute of *213 the executive power vested in the President, and was indispensable to a due execution of the laws and the regular administration of affairs; and, after an animated debate, the power of the President alone to remove officers was affirmed by a majority of fourteen in the House of Bepresentatives, and the casting vote of the Yice-President in the Senate.
This early legislative construction was affirmed by the Supreme Court in,the case of JSx parte Hannen. (13 Peters B., 230.) In that case, the judge of the United States district court of Louisiana, having the power by law to appoint a clerk of the court, had removed the petitioner and appointed his successor; and the question made was as to the power of the judge to remove, and in their opinion the Supreme Court said as follows :
“ In the absence of all constitutional provision or statutory regulation, it would seem to be a sound and necessary rule to consider the power of removal as incident to the power of appointment. This power of removal from office was a subject much disputed, and upon which a great diversity of opinion was entertained, in the early history of this Government. This related, however, to the power of the President to remove officers appointed with the concurrence of the Senate: and the great question was whether the removal was to be by the President alone or with the concurrence of the Senate, both constituting the appointing power. No one denied the power of the President and Senate jointly to remove, where the tenure of office was not fixed by the Constitution, which was a full recognition of the principle that the power of removal was incident to the power of appointment. But it was very early adopted, as the practical construction of the Constitution, that the power was vested in the President alone, and such would appear to have been the legislative construction of the Constitution.”
And the court, after referring to a difference in phraseology in the last of the acts organizing the Executive Departments, concludes as follows:
“ The change of phraseology arose probably from its having become the settled and well-understood construction of the Constitution that the power of removal was vested in the President alone in such cases, although the appointment of the officer was by the President and Senate.”
On this authority there are two distinct constitutional powers of removal: one vested in the President and Senate as incident *214 to their power of appointment; the other vested in the President alone, as an attribute of the executive power belonging to his office. And as to .this, and propably in consequence of the construction made, the form of commissions adopted for officers of the Army and Navy and Marine Corps would seem intended to prevent all question ; for now the commissions run, “ for and during the pleasure of the President.” This no one can determine and declare but himself; and when he declares it the commission necessarily expires by the express terms of its limitation.
But it was contended for the petitioner that the order of dismissal in this case was not in legal effect the order of the President, because it contained no reference to his authority, and was signed only “ Gideon Welles, Secretary of the Navy.” But this point was settled in the case of Wilcox v. Johnson. (13 Peters R., 498.) In that case, the Supreme Court decided that a direction signed by the Secretary of War, with his name only, “ J. C. Calhoun,” and without even the addition of his office, was in legal effeet the order of the President. In that case, as in this, the power exercised belonged to the President, and did not belong to the Secretary, and he could legally exercise it only as the organ of the President. And the presumption of law was therefore that he so used it.
On the authorities cited we think the order of dismissal was legal in form and efficient.
And if the order of dismissal had not been efficient, the petitioner would have been removed by the appointment of his successor by the President, “by and with the advice of the Senate.” Justice Story, in commenting on such a new appointment, in his Commentaries on the Constitution, (sec. 1538,) says as follows: “In short, under such circumstances, the removal takes place, in virtue of the new appointment, by mere operation of law. It results, and is not separable, from the appointment itself.” And it has been said that in the case of Ex parte Hannen, before cited, the judge of the district court had removed the clerk and also appointed his successor. And as to the effect of such new appointment, the Supreme Court, as shown in the brief for the defendant, said as follows: “ The power of the court was a continuing power, and the mere appointment of a successor would be,per se, a removal of the former incumbent, so far as his rights were concerned.” (13 Peters R., 141.) And the nomination of George B. Haycock was expressly made by the President *215 to tbe Senate, "vice First Lieutenant Thomas L. McElrath, dismissed.” The appointment of George B. Haycock was, therefore, to the vacancy in the legal complement of first lieutenants of marines created by the removal of the petitioner. And, by the Constitution, Congress is to provide and maintain a navy, and to make rules for the government and regulation of the land and naval forces. And this is a power to fix the quota of every grade of military and naval officers. And the complement of first lieutenants of the Marine Corps was then fixed by law at thirty, and was filled by the appointment of Lieutenant Haycock. In these circumstances, the President’s revocation of his order dismissing the petitioner could neither displace Lieutenant Haycock nor increase the complement fixed by law by the addition to it of the petitioner; and he, having been once dismissed from the service, could be restored to it only by a new appointment made by the President, by and with the advice of the Senate, and filling a vacancy.
Acts of Congress were referred to in the argument which we think do not affect the case: 1st. The Act July, 1852, (12 Stat. L., 596,) which requests the President to dismiss any officer whose dismission would promote the public service. This certainly did not restrict the President’s power to remove. 2d. The Act 3d March, 1865, (13 id., 489,) which entitled an officer dismissed to apply for a court-martial. The petitioner did not so apply, and therefore never brought himself within the act. 3d. The Act July 13,1866, (14 id., 92]) which enacts that intime of peace no officer shall be dismissed the service except in pursuance of the sentence of a court-martial. This act was not in force when the petitioner was dismissed.
On this part of the case, we are of opinion that from and after June 19,1866, the date of his dismissal from the service, the-petitioner was'not a first lieutenant of marines, and is not entitled to the pay he claims, and was not entitled to that he received.
The United States, by the counter-claim .filed by them, claim to recover the sum of $6,106.53, paid to the petitioner under the circumstances stated in the finding of facts, and we think the United States are entitled to judgment for such recovery, because they are not bound by the mistakes of their officers in the matters committed to them, whether such mistake be of law or of fact.
By the law of agency applicable to individuals, the principal is bound to the full extent of the authority he has apparently *216 given to lhs agent. But by the law of agency belonging to the Government, it is liable only to the extent of the authority it has actually given to its officers. And the reason of the difference is, that an individual has an election whether he will act for himself or by an agent; and if he elects the latter, that should not affect the rights or equities of third persons. But the United States have no such election. They can act only by their agents, and “their name is legion.” And to subject the United States to liability for all the acts of-commissiou or omission of all their agents would be ruinous to the public interests. In the case of The United States v. Kirkpatrick, (9 Wh. R., 720,) the Supreme Court said as follows: “The general principle is that laches are-not imputable to the Government; and this maxim is founded, not on the notion of extraordinary prerogative, but upon a great public policy.” And the meaning of the rule which the Supreme Court declare to be a mamim is, that the United States do not guarantee either the capacity, the integrity, or the care of their officers, and are not responsible for their deficiencies in either. And as the rule must be as broad as its reason, and its reason is the public protection, it overrides individual equities. Therefore, in the case of Dox v. The Postmaster-General, where the suit was on a postmaster’s bond, and the principal was solvent and able to pay his debts when the right of action accrued, and the Postmaster-General was liable by statute for sums due from delinquent postmasters, if he did not cause a suit to be instituted within six months after a default, and he delayed suit for five years, and until after the principal had become insolvent, it was held that the sureties were not discharged, because laches could not be imputed to the Government.
And as this rule is founded on “a great public policy,” established for the public protection, it does not admit of exceptions,but includes mistakes of law as well as mistakes of fact, because the one may be as inj urious to the public interests as the other. In the case of The United States v. The Bank of the Metropolis, (15 Pet. R., 377,) the defendants claimed credits or a set-off, consisting of accepted drafts on the Postmaster-General, the Hon. Amos Kendall. It was contended that his predecessor, Postmaster-General Barry, had made illegal allowances, and that these should be disallowed by Mr. Kendall. As to this the Supreme Court said as follows:
“The third instruction asked the court to say, among other things, if the credits given by Mr. Barry were for extra allow- *217 anees, wbich the said Postmaster-General was not legally authorized to allow, then it was the duty of the present Postmaster-General to disallow such items of credit. The successor of Mr. Barry had the same power, and no more than his predecessor; and the power of the former did not extend to the recall of credits or allowances made by Mr. Barry, if he acted within the scope of official authority given by law to the head of the Department. This right of an incumbent in reviewing a predecessor’s decisions extends to mistakes in fact, arising from error in calculation, and to cases of rejected claims in which material testimony is afterward discovered and produced. But if a credit has been given, or an allowance made, as these were, by the head of a Department, and it is alleged to be an illegal allowance, the judicial tribunals of the country must be resorted to to construe the law under which the allowance was made, and to settle the rights between the United States and the party to whom the credit was given. It is no longer a case between the correctness of one officer’s judgment and that of his successor. A third party is interested, and he cannot be deprived of a payment on a credit so given but by the intervention of a court to pass upon his right. No statute is necessary to authorize the United States to sue in such a case. The right to sue is independent of statute.” — (15 Pet. R., 377.)
The mistake referred to in this citation was assumed and expressed to be a mistake of law, for the resort to the judicial tribunals was to be had “to construe the law under which the allowance was made.” And we think that the citation is an authoritative declaration of the Supreme Court that, where a payment is made to an officer by a mistake of law in a Department, a suit may be maintained by the United States for the recovery of the money paid. And if the United States could maintain a suit for the recovery of the $6,106.53 paid to the petitioner, they can recover it under the counter-claim filed here, for the terms of the act of 1863 extend not only to sums certain, but even to unliquidated damages.
And it is manifest that the petitioner has no equitable claim to the money he received. He rendered no service, after his dismissal, and he intended to render none, for he resigned before he was dismissed, and when he applied to be reinstated he at the same time sent in his resignation. And the general rule of law and equity is, that where a man has received money to which, ex cequo et bono, he is not entitled, an action lies for its *218 recovery. The only exception to this rule is that where between individuals the money has been paid by a mistake of law, it cannot be recovered. But by the text-books this rule rests on no principle, but only on expediency in the litigation of individuals. And on the authorities, and for the reasons stated, we think the rule not applicable to the United States.
The judgment of the court is that the United States recover from the petitioner the sum of $6,106.53, paid to him under the circumstances-stated in the finding of facts.