BichaedsoN, J.,
delivered the opinion of the court:
The claimant alleges that in March, 1878, he entered into a contract with the defendants to lease to them for a post-office, certain premises in Oil City, Pa., for five years from April 1, 1878, at an annual rental of $600 a year, and that the defendants have never performed their agreements, whereby he claims damages for breach of contract on their part.
The findings disclose substantially the following facts:
On the 23d of March, 1878, the claimant, by direction of a special agent of the Post-Office Department, addressed a letter to the First Assistant Postmaster-General proposing to lease the premises for five years from April 1, 1878, at an annual rental of $600, upon certain terms therein specified. On the 27th of March a letter was addressed, for the First Assistant Postmaster-General, to the postmaster at Oil City, accepting the proposition and directing the postmaster to so notify the claimant.
*100 Notice was at once given to the claimant accordingly, and certain questions which he was required to answer were duly answered, signed by him, and returned to the department at ■Washington.
Subsequently, on the 30th of March, the First Assistant Postmaster-General telegraphed and wrote to the postmaster at Oil City, directing him to withhold the acceptance of the proposition until further orders if he had not communicated it to the claimant, and if he had done so, to tell him to regard it as in abeyance for "the present. This was forthwith communicated to the claimant. No formal lease was ever entered into, and nothing further was done, except that the department refused to carry out- the contract or to accept and occupy the premises, or to pay any rent therefor, although the claimant was ever ready and willing to perform his part of the contract.
The defendants deny that these proceedings constituted a contract on their part, even if the First Assistant Postmaster-General had authority to take a lease of the premises.
In the case of Garfielde v. The United States (11 C. Cls. R., 601) the claimant had made proposals to the Post-Office Department for carrying the mails on the routes therein specifled, and the same had been accepted by the Postmaster-General, but no formal contract was written out and signed by the parties as contemplated, because the Postmaster-General suspended his action thereon, precisely as in the present case. This court held that a valid binding contract was made thereby, and the Supreme Court on appeal approved and adopted our views in that regard. Mr. Justice Hunt, speaking for the Supreme Court, says, in his opinion: u The Court of Claims holds that the proposal on the part of Garfielde, and the acceptance of the proposal by the department, created a contract of the same force and effect as if a formal contract had been written out and signed by the parties. Many authorities are cited to sustain the proposition. We believe it to be sound, and that it should be so held in the present case.” (93 U. S., 244; 11 C. Cls. R., 339.)
That exposition of the law, affirmed by the court of last resort, when applied to the present case leads to the inevitable conclusion that the proceedings set forth in the findings must toe held to have created a binding contract between the parties, *101 if the First Assistant Postmaster-General acted within the scope of his authority.
In several of the executive departments the statutes provide for assistants to the heads thereof, and also assistants and deputies to the heads of some of the bureaus. (Rev. Stat., §§ 200, 234, 303, 314, 322, 348, 349, 389, 390, 438, 1168, &c.)
The duties of these assistants are generally not specifically defined by law, but are left to the direction and regulation of superior officers. Such assistants are supposed to have the confidence of those immediately above them, and to be officially engaged in carrying out the will of their principals in the details of the work of the department or bureau in which they are employed.
When their acts, decisions, or directions are reduced to writing, signed by them in their official capacity, filed or recorded among the archives of the department, and do not appear to have been revoked, annulled, or modified by the head of the department or bureau, they must be held, in the absence of fraud, mistake, or irregularity, to have been done within the scope of the authority of the assistant, and to be as binding on the government as though expressly ordered by the superior. Especially is that so when copies of such written documents are sent to this court by the head of the department in which they are found, without objection on his part to their having been made in the due and regular course of business under his control.
In Parish v. The United States (100 U. S., 504), where the authority of an assistant surgeon-general of the Army was called in question as being without the direct approval of the Surgeon-General himself, Mr. Justice Miller, in the opinion given by him for the whole court, reviews this very subject. He says:
‘‘The office of Surgeon-General is one of the distinct or separate bureaus of the administrative service of the War Department. It has been found, in regard to many of these bureaus, and even to the heads of departments, that it is impossible for a single individual to perform in person all the duties imposed on him by his office. Hence statutes have been made creating the office of Assistant Secretaries for all the heads of departments.
“ It would be a very singular doctrine, and subversive of the *102 purposes for wliicb these latter offices were created, if their acts are to be held of no force until ratified by the principal Secretary or head of department. It was to relieve the overburdened principal of some part of those duties that the office of assistant was created. In the immense increase of business in the office of Surgeon-General during the war, similar relief was found necessary, and the office of Assistant Surgeon-General was created.
“For the very reason that the prompt exercise of the powers of the bureau was essential in the field of operations of the Army, the assistant in this case was located at Saint Louis, over a thousand miles from the city of Washington. He was appointed for- the purpose of exercising at that place the functions of the office of Surgeon-General. He was by law the Assistant Surgeon-General. If no virtue attached to his acts until approved by the Surgeon-General, at Washington, any inferior clerk would have answered the imrpose as well.
“It is not intended to deny that he was subordinate to the chief of his bureau, could be ordered to do or not to do particular things, and when an order made by him was disapproved, it might be revoked by that officer. But until so revoked or disapproved it was valid, and parties required to act under it had a right to rely on it.”
So it has been held tiiat as “the President speaks and acts through the heads of the severaldepartments in relation to subjects which appertain to their respective duties,” their acts in such matters may be presumed to have been done by the approbation and direction of the President, and may be considered, in legal contemplation, as his acts. (Wilcox v. Jackson, 13 Pet., 513; McElrath's Case, 12 C. Cls. R., 201, and on appeal, 102 U. S., 436; United States v. Eliason, 16 Pet., 302 ; The Confiscation Cases, 20 Wall., 109.)
In the present case there is nothing in the findings to show that the Assistant Postmaster-General was not acting throughout with the approbation of the head of the department, and the presumption, arising from their official relation to each other, that he was doing so stands unrebutted.
We shall treat the contract as though it were a lease for five years from April 1,1878, made by the claimant to the defendants, and as valid so far, and so far only, as the Post-Office Department or the Postmaster-General had authority to bind the government thereby. As was said in a former case:
“The United States, as a body politic, act only by public officers, who are special agents intrusted with specific, defined *103 duties, and who can bind, the government only to tbe extent of tlie authority conferred upon them. The state has no general agents; the'President is limited in power and authority; Congress must keep within the bounds of the Constitution; the courts are restrained in jurisdiction by statute, and all public officers must obey the law. But the acts of special agents within the scope of their authority are as binding upon the principal as are the acts of general agents.” (McKee's Case. 12 C. Cls. R., 552; see also Whiteside v. The United States, 93 U. S., 257, and 12 C. Cls. R., 24.)
The authority of such agents is found in the statutes of t Congress, and all citizens dealing with the government are] bound to know the law. In every contract, by lease or other-/ wise, with any public officer, all laws applicable to such contract, as to its extent, operation, and the authority for making it, must be considered as stamped thereon and as forming part of the same.
It was said by the Supreme Court, in Pierce v. The United States (7 Wall., 666, and 7 C. Cls. R., 72), that “our statute books are filled with acts authorizing the making of contracts with the government through its various officers and departments; but, in every instance, the person entering into such a contract must look to the statute under which it is made, and see for himself that his contract comes within the terms of the law.”
There are two sections of the Revised Statutes which bear directly on the contract here in suit. They arenas follows:
“ Sec. 3679. No department of the government shall expend, in any one fiscal year, any sum in excess of appropriations made by Congress for that fiscal year, or involve the government in any contract for the future payment of money in excess of such appropriations.
“ Se ). 3732. No contract or purchase on behalf of the United States shall be made, unless the same is authorized by law or is under an appropriation adequate to its fulfillment, except in the War and Navy Departments, for clothing, subsistence, forage, fuel, quarters, or transportation, which, however, shall not exceed the necessities of the current year.”
As this contract, like many, if not most, of the leases for post-offices, is not expressly authorized by any law, it is therefore valid only so far as it is under an appropriation adequate to its fulfillment and is not in excess of such appropriation.
*104 The contract; was made in the latter part of March, 1878. It must be construed with reference to the statutes then in force. At that time there was but one appropriation under which it could be made. This is found in the Act of March 3, 1877, ch. 110 (19 Stat. L., 384), making appropriations for the service of the Post-Office Department for the fiscal year ending June 30, 1878, in these words: “ For rent, light, and fuel, four hundred thousand dollars.” This had not been exhausted, but there remained of it sufficient to meet the requirements of the contract up to the end of that fiscal year. So far, therefore, as the contract relates to that fiscal year it was lawfully made and was binding on the defendants. Beyond that its only force was to give the Postmaster-General each fiscal year thereafter, when a new appropriation should be made, the option to adopt and ratify the contract for another year. This he might do by express notice to that effect, or by entry and occupation of the premises after the commencement of the year. If he should occupy the premises after the beginning of the new year, he might be held to have renewed the obligation on the part of the defendants for that one year.
In other words, a lease for a term of years founded on an annual appropriation is binding on the government only until the end of that year, with a future option from year to year till the end of the lease. Such is the effect of the contract and statutes taken together, to which the contracting parties must be held to have agreed.
In this case the Post-Office Department abandoned the contract before the next appropriation act was passed, and never occupied the premises.
The claimant is therefore entitled to recover the damages which he has suffered by the non-fulfillment of the contract on the part of the defendants for the three months from April 1, 1878, to June 30,1878, the end of the fiscal year, and nothing further. The measure of damages is the rent agreed to be paid by the defendants for that period of time, less whatever rent the claimant received from other tenants of tbe premises. It appears by the findings that the room to which the contract relates was occupied by another party for the entire year, from April 1, 3878, to April 1, 1879, and that the claimant collected from the occupant exactly the same amount of rent therefor as was to have been paid by the defendants. Thus the claimant has suffered no real damages, and his petition must be dismissed.