Davis, J.,
delivered the opinion of the court:
Under this title two cases have been tried together which involve the decision of the obligations of the Government for the occupation as a temporary post-office of a building in Chicago owned by Mr. H. H. Honoré, and to which afterwards, and while in use for postal purposes, the claimants, through the foreclosure of a mortgage, obtained title.
The great fire of 1871 drove the Government to the temporary use of a church, where they remained until July, 1874, when, another fire evicting them, the postmaster, as became a faithful functionary, instantly began search for a new office, that the Government service might not be interrupted or the public inconvenienced.
He practically settled upon the premises known as the Honoré block, and after an informal understanding with the owner began moving into it the clerks and property of his office; meantime a special agent had been dispatched from Washington, who, upon arrival conferred with the postmaster, the supervisor of Government buildings, and the general superintendent of the Railway Mail Service as to suitable quarters for the post-office. They examined several buildings and unanimously settled upon the Honoré block, recommending that a certain portion of it be taken at a rental of $20,000 per annum. The Post-Office Department agreed to this, provided the rooms could be retained until the Government building, then in process of erection, should be “ ready for occupancy.” This stipulation was assented to, it being generally understood that the Government building would probably not be ready for some three years. No written lease was entered into, but the findings show that the Government had the right under the verbal agreement, so far as it was binding, to occupy a defined por *197 tion of the Honoré block at a rental of $20,000 per annum until their own building- should be ready for occupancy. This arrangement was made July 25, 1874, and the defendants remained on the premises until January 4, 1879, paying the rent meantime, not to Honoré, but to the claimants, by virtue of an assignment thereof by Honoré and the Marine Company up to July 31, 1877, when they took possession under their title as purchasers at a foreclosure sale.
On the 4th day of January, 1879, another fire took place, and for the third time the United States post-office was driven forth to seek temporary shelter. This it found in a building on State street, and there remained until April 14,1879, when it removed to the basement of the as yet unfinished Government building. Meantime the claimants had used every endeavor to repair the rooms injured by fire and water, and while they cannot be accused of any lack of dispatch, or of any neglect in this regard, the premises were not ready for occupancy until the middle of the month (Februai’y) succeeding the fire. The post-office authorities had, however, decided not to return to the Honoré block, but to establish themselves in the basement of the incomplete Government building, and so informed the claimants upon the 12th March, 1879, the defendants having prior thereto, and in due course, been notified by the claimants that the former premises were in readiness for them. Out of these facts arises the first claim, which is for rent of that part of the building included in the arrangement of July 25, 1875, until the Government building is ready for occupancy, or, failing in this, then for the quarters ending April 1, July 1, and October 1, 1879. It is to this claim that attention will first be given, as the other two causes of action embraced in the petition largely depend upon the same or similar facts.
What was the tenancy 7 The arrangements were necessarily hasty and informal, the postmaster found himself driven into the street in the dead of night and forced to take immediate measures for the protection of the public interests, and to insure a speedy and safe delivery of the mails. He selected the Honoré building, and, as not a moment was to be lost, began to move into it his subordinates and such of the Government property as had been saved. All this, of course, was technically informal, and the general understanding with the owner, Mr. Honoré, seems to have so recognized it; but other *198 and duly authorized Government agents soon appeared, who, after examination, agreed with the postmaster and recommended the Department to lease a certain portion of the premises at an annual rental of $20,000. This recommendation was approved “provided they [the rooms] can be retained until the Government building is ready for occupancy;” and this is all that there is in writing on the subject of the final agreement as to the length of the term, and practically all that findings show definitely and without dispute as to it.
The arrangement therefore was for an undefined term, to be fixed in the future by the readiness for occupancy of the Government building, and the case presents a parol agreement for the payment of an annual rent, with possession and payment of the rent for several years in proportionate quarterly installments ; there was no written lease, but an entry under a verbal stipulation for an agreed annual rental afterwards paid; an agreement itself within the statute of frauds of Illinois (Strehl v. d’Evers, 66 Ill., 77), but which the parties by their acts under it have erected into a tenancy from year to year. (People v. Rickert, 8 Cowan, 226; Browne on Statute of Frauds, 39.)
The tendency of the law is to treat an occupation by permission undefined in length as a tenancy from year to year whenever the circumstances indicate such an intention, and of these circumstances none is more influential than the payment or agreement to pay an annual rent.
“A lease for no definite time, with an annual rent payable quarterly, is a lease from year to year, and cannot be terminated except at the close of the year, by previous notice to quit of the duration required by statute, or, in the absence of any statutory regulation upon that subject, by the common law, and if the tenant commences a new year without having had notice to quit from the landlord, he cannot be turned out until the next year, but he must pay his rent quarterly as provided in the lease, and perform all the other conditions contained therein. (Leslie v. Randolph, 4 Rawle (Pa.), 123; Wood, Landlord and Tenant, §§ 54, 55, 56; Woodfall, Landlord and Tenant, 174 et seq.; Creighton v. Sanders, 89 Ill., 543.)”
Such was the status of the parties upon July 31, 1877, when the mortgage upon the premises was foreclosed, and when upon the sale the claimants became vested with the ownership of the property. No change, however, took place in fact in the relations of the parties, although the legal position was altered. *199 For three years the Government bad occupied the premises, paying the rent regularly every quarter to the claimants under an assignment; after the foreclosure .the Government continued for some seventeen months to occupy the premises as before, paying the rent quarterly to the claimants, who received it, not as assignees thereof under Honoré’s title, but as owners of the property. Laying aside the first arrangement, that between the Government and Mr. Honoré, we pass to the new relations of the parties, which technically in law must be measured by the same scale as though the claimants bad in no way been before interested in the subject-matter of the case. The purchaser at the foreclosure upon taking possession of his newly-acquired property found in possession thereof a tenant to whom he did not object and who held on for more than a 5'ear, paying quarterly the proper proportion of an an-n ual rental, which was accepted without demur. From this state of facts springs the relation of landlord and tenant under a lease from year to year. We cannot agree that the tenancy was at will, for while its duration was apparently uncertain, the acts of the parties, particularly the reservation and payment oi an annual rental, defeat any such conclusion.
(Wood, Landlord and Tenant, §37; Woodfall, Landlord and Tenant, 194; Clinton Wire Cloth Co. v. Gardner, 99 Ill., 151; Gartside v. Outly, 58 Ill., 210; Leslie v. Randolph, 4 Rawle, 123; Anderson v. Prindle, 23 Wendell, 616; Silsby v. Allen, 43 Vt., 172.)
So that even if the claimants take nothing under the arrangement with Honoré they may found a claim upon the relations existing after the foreclosure sale.
With ability and force counsel have argued that the tenancy in law dates from the first day of the succeeding quarter, to wit, the 1st day of October, to continue from year to year until the notice prescribed by the Illinois statute should be given. The provision of that statute is that the notice shall be of sixty days, and in writing, and it “ may be given at any time within four months preceding the last sixty days of the year.” (Rev. Stat. Ill., ch. 80, § 5.)
These points would be of serious importance in any action between individuals, and may be so in this case provided the Post-Office Department had authority and power to make the contract upon which claimants rely.
*200 Section 3860 authorized the Postmaster-General to allow to certain postmasters, including the one in Chicago, out of the surplus revenue of their respective offices, a reasonable sum for the necessary cost of rent, fuel, lights, &c., and section 3732 prohibits any contract, on the part of the United States “unless the same is authorized by law or is under an appropriation adequate' to its fulfillment,” while section 3679 prohibits any Department from expending in one fiscal year “ any sum in excess of appropriations made by Congress for that fiscal year, or ” from involving the Government “ in any contract for the future payment of money in excess of such appropriations.”
The Government acts by agents whose authority is defined and limited by law, public to the world, and assumed to be known to every individual. (McKee’s Case, 12 C. Cls. R.., 552; Whiteside’s Case, 93 U. S. R., 257; Floyd Acceptances, 7 Wall., 666.)
The contract between the parties to this action was made, therefore, subject to the provisions of section 3679, and in so far as it may involve the Government for the payment of money beyond the current fiscal year it is inoperative and not enforceable against the defendants, even though, as in this case, there was a balance to the credit of the appropriation at the close of the fiscal year sufficient to satisfy the claimants’ demands. This point has already been before this court, and it was held, in McCollum’s Case (17 C. Cls. R., 92), that so far as the contract related to the fiscal year, the appropriation being sufficient,' it was binding, but beyond that its only force was “to give the Postmaster-General each fiscal year thereafter, when a new appropriation should be made, the opportunity to adopt and ratify the contract for another year. In other words, a lease for a term of years founded on an annual appropriation is binding on the Government only until the end of that year, with a future option from year to year till the end of the lease.”
In principle this case and McCollum’s are identical, and we therefore hold that the term of the contract ended June 30,1879, as the Department had prior to that date vacated the premises and informed the claimants that it had no further use for them, having removed to other quarters.
It is further urged by the defendants that the fire of January, 1879, driving the tenants elsewhere in itself operated to *201 free them from further liability for the payment of rent. The findings show that the property was injured to such an extent as not to be ready for occupancy for some six weeks, but it is not pretended that it was destroyed; in fact the time within which it was repaired would rebut any such contention.
There is nothing in the statutes of Illinois changing the provision of the common law that the destruction of buildings does not terminate the tenancy of real estate, but it is argued that this general rule does not apply where a part only of a building is rented; that is, where the purpose of the lease is not the use of the ground but of rooms in a building erected upon it. Taylor’s work on Landlord and Tenant (§ 520), together with the cases there cited, is referred to as authority supporting this point. That author, however, does not push the rule further than to embrace property totally destroyed, and the American cases referred to by him authorize only this, while the law in England, as laid down in Izonv. Gorton (5 Bing. C. P., 501), does not support even this interpretation, for there the tenaucy was held to continue.
Covenants terminating a lease should the buildings be destroyed are strictly construed as against the lessee and are held not to relieve him from liability in case of injury to the building short of destruction; that is, if the injury be of such a nature that the property may be repaired without rebuilding the structure, there is no destruction within the meaning of such a covenant, even if the building be temporarily uninhabitable. (Vanderpoel v. Smith, 2 Daly, N. Y., 135; Wall et al. v. Hinds, 4 Gray, 256.)
We are not prepared to push the exception to the common-law rule further than the courts have already gone, for to hold that a mere injury to the premises, so me tiling temporary in its nature, and which is remedied without delay by the landlord, instantly closes the tenancy would work in most instances manifest injustice. The law of landlord and tenant, the several kinds of tenancies and the differing rights under each, spring from leases of agricultural lands, where the land and not the buildings upon it was the main consideration for the rental paid. With the increase of population and the tendency to concentration in great cities, the land ceases to have that relative importance and the value to the tenant of the building becomes *202 greater. In adapting the law to this new relation the courts have made the exception we have stated to the common-law rule, but this exception is confined to total destruction, which did not take place in the case at bar.
Nor was the tenancy terminated" by the entry of the landlord to repair the damage caused by the fire. We are referred by the Government in support of their contention in this regard to the case of Magaw v. Lambert (3 Pa. St., 444), but there the court say that “the question on the merits is one of fact, not of law,” thus confining their proposition, itself frankly hypothetical, to the particular case before them. The rule seems to be that there is no eviction unless the tenant abandon the premises because of the acts of the landlord claimed to operate as an eviction. (Wood, Landlord and Tenant, § 481, p. 801.) But the Government left the building because of the fire, and after-wards the landlord came in to repair, as he was in duty bound, to remedy the very mischief which had caused the departure of his tenants. The entry of the landlord for this purpose was lawful and commendable, and cannot justly be held to entail the consequences for which the Government contends.
In September, 1877, the Government rented two additional rooms on the first floor of the same block, the term to be from October 1 following until the post-office should be removed into the new Government building; the rental was fixed at $2,500 per annum, payable quarterly. This lease was in the form of a written proposal by the claimants, accepted by telegram to the postmaster from the Department in Washington; the rent was paid quarterly to December 31, 1878, but not since that date; the same claim is made as in the first cause of action.
In March, 1878, the claimants proposed to the defendants to lease certain rooms on the fourth floor at a yearly rental of $800, and these rooms were occupied and the agreed rental paid to December 31, 1878, and claim is also made for the rent thereof for the same period as in the other two causes of action.
These two claims do not differ in principle or materially in fact from that already discussed and must abide by' the same ruling.
We therefore hold that claimants are entitled to recover the rent of the portions of the premises leased by them to the Government and described in the findings herein from January 1, 1879, to July 1, 1879, less the amount paid to them during that *203 period by other tenants, and which it was agreed by both parties to this action might be accepted without predjudice. Judgment for the claimants in the sum of $11,450.