BaeNet, J.,
delivered the opinion of the court:
The claimant in this case was, on the 19th day of June, 1903, appointed a midshipman at the United States Naval Academy, upon the nomination of the member of Congress from the Eleventh District of New York, such appointment being made by direction of the President. The claimant remained thereafter at the Naval Academy as a member of the fourth class until June 10, 1904, when he completed his annual examination and became a member of the third class, and while a member of the latter class and on the 3d day of February, 1905, his dismissal from the Academy was recommended by the Superintendent of the Academy for continued violation of the regulations regarding the use of tobacco.
Thereafter, and on the 7th day of February, 1905, claimant was dismissed from the Naval Academy by the following order:
“ Navy DepartmeNT,
“ Washington, February 7, 1905.
“ Sir : In accordance with the recommendation of the Superintendent of the U. S. Naval Academy you are hereby dismissed from the Naval Academy and from the naval service for continued violation of the regulations regarding the use of tobacco.
“ Respectfully, “ Paul MortoN,
“ Secretary.
“ Mr. Emery C. Weller,
“ Late Midshipman, U. S. Navy,
“ Third Glass, U. S. Naval Academy,
“Annapolis, Maryland.”
On the 3d day of July, 1905, Edgar Arden Logan was duly appointed as a midshipman from the said Eleventh *334 district of New York, to fill the vacancy caused by such dismissal of the claimant.
The claimant received 198 demerits from June 1, 1904, to January 27,1905, inclusive, but for the violation of the regulation which was the immediate cause of his dismissal no demerits are recorded.
This suit is brought to recover both the pay and rations of the claimant as midshipman from February 9, 1905 (the date he was actually dismissed from the‘academy), to the date of the filing of the petition, May 15, 1905, being the sum of $160.31, it being the contention of the claimant that the order for his dismissal was absolutely null and void and that he is still a midshipman in the United States Navy and has been such ever since his said dismissal*
The thirty-sixth Article of War of the Navy, section 1624, Revised Statutes, is as follows:
“No officer shall be dismissed from the naval service except by order of the President or by sentence of a general court-martial; and in time of peace no officer shall be dismissed except in pursuance of the sentence of a general court-martial or in mitigation thereof.” .
Section 1229 of the'Revised Statutes is as follows:
“ Sec. 1229, The President is authorized to drop from the rolls of the Army for desertion any officer who is absent from duty three months without leave; and no officer so dropped shall be eligible for reappointment. And no officer in the military or naval service shall in time of peace be dismissed from service except'upon and in pursuance of the sentence of a court-martial to that effect, or in commutation thereof.”
The following are some of the rules of the Naval Academy:
“ 351. Removal from the service can be ordered only by the Secretary of the Navy.
“ 352. A cadet may be recommended for dismissal who shall be found guilty of any one of the following-named offenses: Falsehood, fraud, theft, gouging, intoxication, introducing intoxicating liquors, gambling, mutinous conduct, insubordination, deliberate disobedience of orders, answering for another at roll call, irreverent conduct at divine service.
*335 “ 365a. The number of demerits allowed for the year shall be as follows:
First class_150
Second class_200
Third class_250
Fourth class_300
“And when any cadet shall have received more than the number allowed his class, he shall be deficient in conduct, and so reported to the Navy Department.
“ 365c. Any cadet who shall have received, on or before the semiannual examination, two-thirds of the number of demerits allowed, may be declared deficient in conduct.”
The act of March 2, 1895 (28 Stat. L., 838), among other things provides—
“ that the Secretary of the Navy shall have power to convene general courts-martial for the trial of naval cadets, subject to the same limitations and conditions now existing as to other general courts-martial, and to approve the proceedings and execute the sentences of such courts, except the sentences of suspension and dismissal, which, after having been approved by the Superintendent, shall not be carried into effect until confirmed by the President.”
The acts of June 23, 1874, and March 3, 1903 (18 Stat. L., 203, and 32 Stat. L., 1198), also make provisions for the convening of courts-martial, but only for the trial of the offense of hazing.
It is contended by the claimant (1) that he was not dismissed from the academy by the President; (2) that he was an officer of the Navy at the time of his dismissal from the academy, and hence that the same was null and void, because not “ in pursuance of a court-martial or in mitigation thereof.”
As to the first contention it has been frequently decided, both by this court and the Supreme Court, that as “ The President speaks and acts through the heads of the several departments in relation to subjects which appertain to their respective duties, their acts in such matters may be presumed to have been done by the approbation and direction of the President, and may be considered, in legal contemplation, as his acts.” (McCollum v. United States 17 C. Cls. R., 92, 102; McElrath v. United States 12 C. Cls. R., 201-214; Wilcox v. Jackson 13 Peters, 498; McElrath v. United *336 States 102 U. S., 426). And this is particularly true when the order of dismissal is reenforced, as in this case, by an order, by direction of the President, filling the vacancy caused by the dismissal of the claimant. (McElrcth v. United States, supra; Blake v. United States, 103 U. S., 436; Mullan v. United States, 140 U. S., 240).
If the order had been made by the chief of a bureau or any other inferior officer “ by order of the Secretary of the Navy,” or if the order upon its face or from any other surrounding circumstances showed that it was the 'act of the Secretary alone, perhaps the presumption would be otherwise, but in the present case we decide that the order dismissing the claimant was, in legal contemplation, the act of the President.
As to the second proposition, there is more difficulty in reaching a conclusion, growing out of some confusion in the statutes bearing on the question. In will not be questioned that the President has the power to dismiss a delinquent midshipman from the Naval Academy, excepting only as that power may be restricted by section 1229 and article 36. (Section 1624, supra.) Whether Congress has the constitutional power of such restriction it is 'not necessary to decide in this case.
The statutes appear to be entirely silent upon the subject as to who shall make the appointments of midshipmen at the Naval Academy, except that if Members of Congress fail to nominate, such vacancies shall be filled by appointment of the Secretary of the Navy. (Rev. Stat., sec. 1514.) The appointment in this case was made “ by direction of the President,” and we understand that is and has been the universal-practice in the making of appointments with the exception above stated.
The first act of Congress providing for midshipmen in the Navy gave their selection, like other naval officers, to the President (1 Stat., 350), and it was not until by act of Congress, August 31, 1852 (10 Stat. L., 102), that provision was made for their recommendation by Members of Congress. This fact doubtless accounts for the present silence of the Revised Statutes with reference to their appointment, in con *337 trast with the provisions relating to cadets at the Military Academy. (Rev. Stat., sec. 1315.) .
Midshipmen in the naval service were first provided for in the act of Congress providing a naval armament by the act of March 27, 1794 (1 Stat., 350), and they are therein dominated “warrant officers.” By the act of July 16, 1862 (12 Stat. L., 583), midshipmen are made ninth in grade in the active list of line officers of the Navy. Section 1362 of the Revised Statutes of 1878 names the active list of the officers of the Navy and makes midshipmen the eleventh of the list of the different grades therein provided for. The naval appropriation act of March 3, 1883 (22 Stat. L., 472), changed the title of “ midshipman ” to “ ensign,” the effect of which Avas to discontinue the grade of midshipman in the Navy.
The act of June 26,1884 (23 Stat. L., 60), provides that all graduates of the Naval Academy on the successful completion of the six years’, course shall be commissioned as ensigns in the Navy, and the grade of junior ensign is therein abolished.
Section 7 of the act of March 3, 1899 (30 Stat. L., 1004), knoAvn as the navy-personnel act, names the list of the line officers of the Navy, including ensigns, and the name of midshipman is hot found therein.
This is a brief history of the office of midshipman in the United States Navy in so far as that position has been independent of the Naval Academy, and it thus appears that since the passage of the act of March 3, 1883 (supra), there has been no such rank as midshipman in the United States Navy except as that title has been given to students at the ■NaATil Academy.
Students at the Naval Academy were styled “ cadet midshipmen ” by the act of July 15, 1870 (16 Stat. L., 334), and the same act provided that after successfully passing the examination at the academy they should receive appointments as midshipmen. This title Avas changed to “ naval cadet ” by the act of August 5, 1882 (22 Stat. L., 284), and the latter title to “ midshipmen ” by the act of July 1, 1902 (32 Stat. L., 686).
*338 The first statutory provision for a naval academy was made by act of Congress August 10, 1846 (9 Stat. L., 100, 101). when the modest sum of $28,200 was appropriated “ for repairs, improvement, and instruction at Fort Severn, Annapolis, Maryland.”
Prior to that time instruction had been given to midshipmen in the naval service in a desultory manner — sometimes on shipboard and sometimes at various places on shore when they were not on sea duty, and this seems to have been done without direct authority of Congress, but-by what a writer has termed “ wise departmental legislation.” During the first few years of the Naval Academy its students were taken directly from midshipmen in the Navy, some of whom had been several years in the service.
The act of January 2, 1813 (2 Stat. L., 789), authorizing the construction of four seventy-four gun ships, provided that each of them should carry a schoolmaster, appointed by the captain, with a pay of $25 per month; and each ship had twenty midshipmen who were presumably under the instruction of this schoolmaster.
The first official suggestion of a naval academy occurs in the report of Hon. William Jones, Secretary of the Navy during President Madison’s Administration, addressed to the Senate, and in which he says:
“ I Avould suggest the expediency of providing by law for the establishment of a naval academy with suitable professors for the instruction of the officers of the Navy.” * * * (November 15, 1814, American State Papers, 320.)
President John Quincy Adams, in his message to Congress in December, 1825, in his recommendations regarding the Navy, said:
“ * * * the want of a naval school of instruction corresponding with the Military Academy at West Point, for the formation of scientific and accomplished officers, is felt with daily increasing aggravation.” (Messages and Papers, Vol. II, 310.)
In 1845 Hon. George Bancroft, then Secretary of the Navy, called upon the Board of Examiners of the Navy for a report in relation to a “ more efficient instruction of the young naval officers.” This board in its reply, dated June 25, 1845, among other things said:
*339 “ It would be very desirable that a grade of naval cadets inferior to that of midshipmen should be created by law, who should compose the primary classes of the naval school and from which all appointments of midshipmen should be made, * * * and a board authorized to determine with rigid scrutiny his fitness for ultimate service in the Navy. These cadets should be appointed in the same manner as those at West Point.”
It will thus be seen that our Naval Academy is a growth and an evolution, and in that respect somewhat different from the Military Academy.
Its first pupils were officers already in the naval service, holding their warrants from the President. They have gradually ceased to be midshipmen in the active service belonging to the line, and are now naval students, the same as cadets at the Military Academy are military students.
This history of the different laws of Congress relating to the Naval Academy and the position and title of midshipman is instructive in reaching a conclusion upon the question as to whether at the present time they are “ officers ” of the Navy within the meaning of that term as used in section 1229.'
That students at the Naval Academy are and always have been in the naval service of the United States in some capacity has never been doubted, and it was decided in Cook v. United States (128 U. S., 254), that they were “ officers ” of the United States within the meaning of the provisions of the act of March 3, 1883 (22 Stat. L., 473), respecting the longevity pay of officers and enlisted men in the Army and Navy.
It has also been decided that a paymaster’s clerk is an “ officer ” of the Navy within the meaning of the same statute — Hendee v. United States (124 U. S., 309) — and in the latter case it is said:
“ While we do not concede that a paymaster’s clerk is, for all purposes and in the general sense of that term, an officer of the Navy, we believe that within the meaning of the statute now under consideration, providing for increase of pay to officers of the Navy according to length of service, that it was the purpose of the framers of that act to include service rendered as a paymaster’s clerk in the Navy.”
*340 In the case of Morton v. United States (112 U. S., 1), under a similar statute providing longevity pay, it was held that the time of service of a military cadet at' West Point is to be rebarded as “ actual service in the Army ” within the meaning of the acts of February 24, 1881, and June 30, 1882 (21 Stat. L., 346, and 22 Stat. L., 118), in-computing his increase of pay after each term of five years’ service under section 1262 of the Kevised Statutes.
In the latter case attention is called to the fact that by section 6 of the act of July 16, 1198 (1 Stat., 605), cadets are called noncommissioned officers in the United States Army; also the provision of the act of March 16, 1802 (2 Stat., 132), wherein cadets are recognized as belonging to the Army.
In Baker v. United States (125 U. S., 646) the claimant was appointed September 30; 1867, a midshipman in the United States Navy by virtue of the laws then in force relating to the Naval Academy. He graduated from the academy in 1872, and before his graduation Congress, by the act of July 15, 1870 (16 Stat. L., 334), changed the title of students at the Naval Academy from “ midshipmen ” to “ cadet'midshipmen.” Upon graduation he was commissioned ensign, and was thereafter promoted through the several grades to lieutenant, in which grade he was serving when he filed his petition in this court to recover longevity pay under the act of March 3, 1883 (supra), claiming that his service at the Naval Academy was service as an “officer in the Navy” under that statute. He recovered in this court (Baker v. United States, 23 C. Cls. K., 181) and upon appeal to the Supreme Court that decision was affirmed. It may be instructive in this case to know that the Supreme Court in its; opinion in that case lays great stress upon the fact that the claimant at the time of his appointment to the Naval Academy was named as a “ midshipman ” pursuant to the la ay then in force, and also that according to law then in force midshipmen were ninth in grade in the active list of the officers of the Navy. (12 Stat. L., 583.)
We now come to those cases where the term “ officer,” as used in section 1229, has been construed. In the case of *341 Perkins v. United States (116 U. S., 483; 20 C. Cls. R., 438) the claimant entered the Naval Academy as a cadet engineer and graduated therefrom June 10, 1881. He was thereafter assigned to duty in the Navy and regularly paid the rates prescribed by section 1556 of the Revised Statutes, viz, $1,000 at sea, $800 on shore duty, and $600 on leave or waiting-orders. On the 26th day of June, 1883, he was honorably discharged from the Navy by an order of the Secretary of the Navy, and he filed his petition in this court to recover his pay, contending that his discharge was illegal and that he was still an officer of the Navy. He recovered in this court, and upon appeal the judgment was affirmed by the Supreme Court. In the opinion in that case in both courts Perkins was held to be an officer within the meaning of section 1229.
That case differs from the one at bar in several particulars :
(1) The claimant received his-appointment under a different statute and from a different source. He was appointed pursuant to sections 1522-1525 of the Revised Statutes then in force, and which required some technical knowledge before admission.
(2) He had graduated from the Naval Academy and had served in the Navy two years under orders.
(3) The course then prescribed for cadet engineers was four years (sec. 1524), so that the claimant was no longer a cadet, and necessarily must have been an officer of some grade and by his pay had been so recognized.
It should also be remarked that it was conceded that the claimant might have been dismissed for misconduct under the provisions of section 1525 entirely independent of section 1229.
In Hartigan v. United States (196 U. S., 169; 38 C. Cls. R., 346) the claimant was summarily dismissed from the West Point Military Academy for misconduct, and it was held both in this court and in the Supreme Court that he was not an officer within the meaning of section 1229, and hence could be dismissed without trial and conviction by a court-martial. In the opinions of both courts in that case a clear distinction is pointed out between service at the academy and *342 in the Army, and that, while military cadets are a port of the Army, they are not officers of the Army, but rather are undergoing instruction to become such; and in- the opinion of this court this significant expression occurs:
“ These appointments (to the academy) are made by the President without the advice and consent of the Senate, and it seems plain that Congress did not intend by any legislation that had been enacted to withhold from him the power of summary dismissal for the good of the academy, for such a power can wisely be left to his discretion.”
The application of this decision to the present case can be realized when we recur to the fact that in the previous case (Morton v. United, States, supra) it had been held in both courts that a West Point cadet should be regarded as an officer in the Army so far as relates to service in the Army, entitling him to longevity pay.
We know of no reason why a midshipman at the Naval Academy at the present time should have privileges and rights denied to a cadet at the Military Academy, and we do not believe the law, properly construed, makes any such distinction. Neither of them holds either a commission or a warrant. Both are appointed by the President; those appointed at the Military Academy are called cadets and those at the Naval Academy are now called midshipmen. .
There may have been a time in the history of the Government and the Naval Academy when a midshipman should have been regarded as an officer in the Navy within the meaning of section 1229, and when the students at the Naval Academy were on a different footing in that regard than the students at the Military Academy, but the reason for so holding no longer exists. The act of March 3, 1883 (supra), changed the title of midshipmen in the Navy to ensign, and the act of March 3,1899, leaves midshipmen out of the list of line officers of the Navy, so that now there are no midshipmen except those appointed to the Naval Academy and undergoing instruction therein or in connection therewith.
Under section 1519 (supra) midshipmen found deficient at any examination may be dropped from the service. Under section 1547 (supra) the Secretary of the Navy, with *343 the approval of the President, may issue regulations’and instructions for the Navy, and the regulations referred to for the Naval Academy were presumably made pursuant to such power. It will not be contended that a midshixoman at the Naval Academy can not be dismissed or “ not continued therein ” (which is the same thing), for deficiency at an examination, without a trial by court-martial (sec. 1519) ; and if the academic board can do this, is it not an anomalous condition of affairs if the President can not dismiss a midshipman from there because of a deficiency in conduct, i. e., insubordination or disobedience of orders, and particularly when the regulations so provide ?
Under the act of March 2, 1895, it is provided: “ The Secretary of the Navy shall have power to convene courts-martial for the trial of naval cadets.” But in our opinion this is not mandatory, and we think the President has the power and authority to dismiss naval cadets, or “ midshipmen,” as they are now styled, under the statutes and regulations before referred to, without the intervention of trial by court-martial.
We might add, in conclusion, that the act of March 2, 1895, and the other laws cited relating to the Naval Academy, have for many years been construed by the Navy Department to authorize the dismissal of students without a trial by court-martial, and that has often been done. It has been frequently decided that where the meaning of a statute is doubtful the uniform and long-continued construction placed upon it by Department officers charged with its execution is entitled to much weight. (Brown v. United States, 113 U. S., 568; Edwards v. Darby, 12 Wheat., 206; United States v. Sweet, 189 U. S., 471-474; United States v. Johnston, 124 U. S., 236, 253; United States v. Finnell, 185 U. S., 236, 244.)
It is ordered that the petition be dismissed.