RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
File Name: 09a0361p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————————————

UNITED STATES OF AMERICA,
                              *Plaintiff-Appellee,*

        *v.*

MARCUS CAIN,
                              *Defendant-Appellant.*

No. 07-4535

———————————————

Appeal from the United States District Court
for the Northern District of Ohio at Akron.
No. 07-00290—Donald C. Nugent, District Judge.

Argued: April 28, 2009

Decided and Filed: October 13, 2009

Before: GUY, ROGERS, and GRIFFIN, Circuit Judges.

———————————————

## COUNSEL

**ARGUED:** Amy B. Cleary, FEDERAL PUBLIC DEFENDER'S OFFICE, Cleveland, Ohio, for Appellant. Michael A. Sullivan, ASSISTANT UNITED STATES ATTORNEY, Cleveland, Ohio, for Appellee. **ON BRIEF:** Amy B. Cleary, FEDERAL PUBLIC DEFENDER'S OFFICE, Cleveland, Ohio, Debra K. Migdal, FEDERAL PUBLIC DEFENDER'S OFFICE, Akron, Ohio, for Appellant. Michael A. Sullivan, ASSISTANT UNITED STATES ATTORNEY, Cleveland, Ohio, for Appellee.

     ROGERS, J., delivered the opinion of the court, in which GUY, J., joined. GRIFFIN, J. (pp. 25–42), delivered a separate dissenting opinion.

———————————————

## OPINION

———————————————

     ROGERS, Circuit Judge. This appeal requires us to determine when the registration requirements of the federal Sexual Offenders Registration and Notification Act (SORNA) became effective with respect to a defendant who had been convicted of a sexual offense

1

before passage of SORNA. The Government indicted defendant Cain under 18 U.S.C. § 2250 for traveling from Ohio to Georgia sometime between October 16, 2006, and March 28, 2007, and failing to update his sex offender registration as required by state and federal law. The circuits are split on whether defendants with pre-SORNA convictions had to comply with SORNA before the Attorney General issued an implementing regulation. Because SORNA explicitly required the Attorney General to specify the applicability of the Act to persons convicted prior to the effective date of SORNA, and because the Attorney General did not promulgate a regulation making that determination in compliance with the Administrative Procedure Act, Cain was not subject to SORNA's requirements during the period indicated in the indictment. Reversal is therefore required.

There are three elements to criminal liability under SORNA: prior conviction of a sexual offense, interstate travel[1], and failure to register. A simplified time-line for this case is as follows:

1998: Cain convicted of a sexual offense.

July 27, 2006: enactment and general effective date of SORNA.

Approximately October 2006: Cain travels interstate.

February 28, 2007: the Attorney General promulgates an emergency regulation specifying the applicability of the registration requirement to persons convicted before July 27, 2006.

March 28, 2007: last date on which the indictment alleges that Cain failed to register.

Two legal determinations, each the subject of conflicting views among our circuit court colleagues around the nation, require us to conclude that SORNA does not apply to Cain's failure to register. First, SORNA's registration requirement did not become effective against persons like Cain (i.e., who were convicted of a sexual offense before

---

[1]In addition to interstate travel, a defendant may also fulfill the second element if the predicate sexual offense was a violation of federal law or was committed in a federal enclave. *See* 18 U.S.C. § 2250(a)(2)(A).

July 27, 2006) until the Attorney General validly so specified pursuant to SORNA. Second, the Attorney General's specification did not take effect against Cain because the Attorney General did not show good cause to waive the notice and comment and delay of effectiveness requirements of the Administrative Procedure Act. It follows that Cain was not subject to SORNA's registration requirement during the period alleged in the indictment.

Because the indicted failure to register occurred before SORNA became effective against Cain, it is not necessary for us to decide whether the interstate travel element of the crime had to occur after the effectiveness of the SORNA obligation, as held for instance in *United States v. Husted*, 545 F.3d 1240, 1241 (10th Cir. 2008), or whether instead the interstate travel element could have preceded the effectiveness of the SORNA obligation, as held in *United States v. Dixon*, 551 F.3d 578, 584-85 (7th Cir. 2008), *cert. granted sub nom. Carr v. United States*, 77 U.S.L.W. 3610, 78 U.S.L.W. 3011 (U.S. Sept. 30, 2009) (No. 08-1301).[2]

## I.  Factual Background

In October 1998, Ohio convicted Cain of attempted rape. This conviction led to Cain's classification as a Sexually Oriented Offender under Ohio law, which required him to register as a sex offender with the state, verify his address annually, and notify the sheriff within seven days of changing his residence.

On July 27, 2006, the President signed SORNA into law. Because the statute did not expressly provide for its effective date, the statutory provisions took immediate effect. *See United States v. Gavrilovic*, 551 F.2d 1099, 1103 (8th Cir. 1977).

During the summer of 2006, Cain told his parole officer that he intended to move to Georgia. On September 18, 2006, Cain met with his parole officer in Ohio. He evidently left the state soon thereafter without updating his registration in either Ohio

---

[2]Our disposition of the case likewise makes it unnecessary to reach several of the other constitutional challenges Cain asserts against SORNA, including those based on the Due Process Clause, the nondelegation doctrine, the Commerce Clause, and the Spending Clause.

or Georgia, though the record does not reflect precisely when he traveled interstate.  On October 16, 2006, Cain failed to appear to complete the annual registration required by Ohio law.  Ohio issued a warrant for Cain's arrest.

On February 28, 2007, the United States Attorney General promulgated a regulation specifying that the registration requirements of SORNA applied to persons convicted before July 27, 2006.  *See* 28 C.F.R. § 72.3.

On March 28, 2007, based on the warrant Ohio had issued, Georgia authorities arrested Cain.  Ohio charged Cain for his failure to comply with its sex offender laws, but later dismissed the charges for reasons not specified in the record.  Meanwhile, a federal grand jury indicted Cain for violating SORNA.

The grand jury accused Cain of violating 18 U.S.C. § 2250 by, "[f]rom on or about October 16, 2006, through on or about March 28, 2007 . . . [being] an individual who was required to register pursuant to [SORNA], having, after [his state conviction of attempted rape], traveled in interstate commerce, . . . knowingly fail[ing] to register and update registration as required by [SORNA]."

Cain moved to dismiss the indictment on various grounds.  One day after the Government filed a response to Cain's motion to dismiss, Cain agreed to change his plea to guilty pursuant to a plea agreement.  The plea agreement specifically reserved the right to appeal the district court's "denial of Defendant's Motion to Dismiss," though the court had not yet ruled on that motion.

The district court never issued a written ruling on the motion to dismiss.  At sentencing, the court stated that it was "adopting the Government's response and rationale" to deny the motion, though it noted that Cain could appeal that decision, and that the law "is in a state of flux."

The district court sentenced Cain to five months of imprisonment with credit for time served, and five years of supervised release.  Cain appeals only the denial of the motion to dismiss.

## II.  Legal Background

SORNA created a new federal crime of "failure to register."  This crime has three elements:

> Whoever—
>           (1) is required to register under [SORNA];
>           (2)     (A) is a sex offender as defined for the
>                   purposes of [SORNA] by reason of a
>                   conviction under Federal law (including
>                   the Uniform Code of Military Justice), the
>                   law of the District of Columbia, Indian
>                   tribal law, or the law of any territory or
>                   possession of the United States; or
>                   (B) travels in interstate or foreign
>                   commerce, or enters or leaves, or resides
>                   in, Indian country; and
>           (3) knowingly fails to register or update a registration as
>           required by [SORNA];
> shall be fined under this title or imprisoned not more than 10 years, or
> both.

18 U.S.C. § 2250(a).

The criminal requirement refers to the registration requirement contained in a different section of SORNA, 42 U.S.C. § 16913.  That section provides:

> (a) In general
>
> A sex offender shall register, and keep the registration current, in each jurisdiction where the offender resides, where the offender is an employee, and where the offender is a student.  For initial registration purposes only, a sex offender shall also register in the jurisdiction in which convicted if such jurisdiction is different from the jurisdiction of residence.
>
> (b) Initial registration
>
> The sex offender shall initially register—
>
>           (1) before completing a sentence of imprisonment with
>           respect to the offense giving rise to the registration
>           requirement; or

> (2) not later than 3 business days after being sentenced
> for that offense, if the sex offender is not sentenced to a
> term of imprisonment.

> (c) Keeping the registration current

> A sex offender shall, not later than 3 business days after each change of
> name, residence, employment, or student status, appear in person in at
> least 1 jurisdiction involved pursuant to subsection (a) of this section and
> inform that jurisdiction of all changes in the information required for that
> offender in the sex offender registry. That jurisdiction shall immediately
> provide that information to all other jurisdictions in which the offender
> is required to register.

42 U.S.C. § 16913.

Thus, subsection (a) of § 16913 requires a sex offender to register and keep the registration current. Subsection (c) further requires that a sex offender appear in person to inform the authorities each time he changes his name, residence, employment, or student status. However, § 16913(d) further provides:

> (d) Initial registration of sex offenders unable to comply with subsection
> (b) of this section

> The Attorney General shall have the authority to specify the applicability
> of the requirements of this subchapter[3] to sex offenders convicted before
> July 27, 2006,[4] or its implementation in a particular jurisdiction, and to
> prescribe rules for the registration of any such sex offenders and for other
> categories of sex offenders who are unable to comply with subsection
> (b) of this section.

42 U.S.C. § 16913(d).

On February 28, 2007, the Attorney General promulgated a regulation stating that SORNA's requirements "apply to all sex offenders, including sex offenders convicted of the offense for which registration is required prior to the enactment of that Act."

---

[3] The text enacted read "title" rather than "subchapter." "Title" in the bill as enacted refers to the sections that became 42 U.S.C. §§ 16901-16928 as well as other scattered sections including the one that became 18 U.S.C. § 2250. *See* H.R. 4472, 109th Cong. § 113, Pub. L. No. 109-248, 120 Stat. 587, 594 (2006).

[4] The text enacted read "before the enactment of this Act," rather than the codified text. *See* H.R. 4472, 109th Cong. § 113, Pub. L. No. 109-248, 120 Stat. 587, 594 (2006).

28 C.F.R. § 72.3.  The statement accompanying the regulation noted that defendants with convictions before July 27, 2006, had argued that SORNA did not apply to them because the Attorney General had not issued a regulation specifying SORNA's applicability to them.  *See* Applicability of the Sex Offender Registration and Notification Act, 72 Fed. Reg. 8894, 8896 (published Feb. 28, 2007).  The Attorney General stated that he was issuing the rule to foreclose that argument, regardless of whether SORNA would apply to such defendants without the regulation.  *See id.*  The Attorney General also claimed that the rule qualified for the "good cause" exceptions to the Administrative Procedure Act's notice and comment requirement and to the APA's requirement that regulations be published at least thirty days before their effective date.  *Id.*; *see* 5 U.S.C. § 553(b)(B), (d)(3).  The Attorney General justified that claim with the following statement:

> The immediate effectiveness of this rule is necessary to eliminate any possible uncertainty about the applicability of the Act's requirements—and related means of enforcement, including criminal liability under 18 U.S.C. 2250 for sex offenders who knowingly fail to register as required—to sex offenders whose predicate convictions predate the enactment of SORNA.  Delay in the implementation of this rule would impede the effective registration of such sex offenders and would impair immediate efforts to protect the public from sex offenders who fail to register through prosecution and the imposition of criminal sanctions.  The resulting practical dangers include the commission of additional sexual assaults and child sexual abuse or exploitation offenses by sex offenders that could have been prevented had local authorities and the community been aware of their presence, in addition to greater difficulty in apprehending perpetrators who have not been registered and tracked as provided by SORNA.  This would thwart the legislative objective of "protect[ing] the public from sex offenders and offenders against children" by establishing "a comprehensive national system for the registration of those offenders," [42 U.S.C. § 16901], because a substantial class of sex offenders could evade the Act's registration requirements and enforcement mechanisms during the pendency of a proposed rule and delay in the effectiveness of a final rule.  It would accordingly be contrary to the public interest to adopt this rule with the prior notice and comment period normally required under 5 U.S.C. 553(b) or with the delayed effective date normally required under 5 U.S.C. 553(d).

Applicability of the Sex Offender Registration and Notification Act, 72 Fed. Reg. at 8896-97. The rule purported to take immediate effect. *Id.* at 8895. However, the Attorney General stated that he would accept comments on the rule through April 30, 2007. *Id.*

Cain now argues that he does not meet the first and third elements of § 2250 because, until an effective regulation so specified pursuant to § 16913(d), he was not a person "required to register" and update his registration under SORNA. The Government argues that SORNA required offenders convicted before its enactment to register even before the Attorney General issued the regulation.

### III. Need for Attorney General Specification of Applicability to Pre-SORNA Convicts

Cain's indictment must be dismissed because § 16913 requires the Attorney General to issue implementing regulations before SORNA applies to sex offenders convicted before SORNA's enactment.

The text of subsection 16913(d), as passed by Congress and signed by the President, reads:

> The Attorney General shall have the authority to specify the applicability of the requirements of this title to sex offenders convicted before the enactment of this Act or its implementation in a particular jurisdiction, and to prescribe rules for the registration of any such sex offenders and for other categories of sex offenders who are unable to comply with subsection (b).

*See* H.R. 4472, 109th Cong. § 113, Pub. L. No. 109-248, 120 Stat. 587, 594 (2006).

### A. Plain Meaning

The plain meaning of this text requires the Attorney General to make his specification before SORNA applies to offenders whose convictions predate SORNA. The statutory language gives the Attorney General two types of authority: (1) to "specify the applicability of the requirements" of SORNA to certain sex offenders, and (2) to "prescribe rules for the registration of" certain sex offenders.

As Judge McConnell has explained, the subsection "has two clauses. The first clause says, unambiguously, that the Attorney General has the authority to specify the requirements of . . . all of SORNA . . . to those who were convicted of a sex offense before the date of enactment . . . or [SORNA's] implementation in a particular jurisdiction." *United States v. Hinckley*, 550 F.3d 926, 949 (10th Cir. 2008) (McConnell, J., dissenting). "The second clause gives the Attorney General quite a different authority: to prescribe rules for the registration both of those whose offenses predate SORNA and also for 'other categories of sex offenders' who, for whatever reason, are unable to comply with the initial registration requirements of SORNA. This clause also does not present any ambiguity." *Id.* "There is no grammatical reason to limit the category of pre-SORNA offenders to those who are unable to comply with subsection (b), for purposes of either clause." *Id.* at 950.

Because the Attorney General has authority to "specify" the applicability of SORNA's requirements to certain sex offenders, SORNA did not apply to those offenders until the Attorney General exercised that authority. "[T]he general rule [is] that criminal statutes are to be strictly construed against the Government." *United States v. Monasterski*, 567 F.2d 677, 681-82 (6th Cir. 1977) (citations omitted). Congress did not enact language providing a default position that the statute applied unless the Attorney General excused compliance; the statute does not read "the Attorney General shall have the authority to waive the applicability of the requirements of this subchapter." Rather, pursuant to § 16913(d), SORNA did not apply to certain offenders until the Attorney General specified that it did.

This reading is in accord with that of three of the five circuits that have addressed this issue. *See United States v. Hatcher*, 560 F.3d 222, 226-29 (4th Cir. 2009); *United States v. Dixon*, 551 F.3d 578, 581, 582, 585-86 (7th Cir. 2008), *cert. granted sub nom. Carr v. United States*, 77 U.S.L.W. 3610, 78 U.S.L.W. 3011 (U.S. Sept. 30, 2009) (No. 08-1301); *United States v. Madera*, 528 F.3d 852, 856-59 (11th Cir. 2008). *But see United States v. Hinckley*, 550 F.3d 926, 929-35 (10th Cir. 2008), *cert. denied*, 129 S.

Ct. 2383 (2009); *United States v. May*, 535 F.3d 912, 916-19 (8th Cir. 2008), *cert. denied*, 129 S. Ct. 2431 (2009).

The identity of the offenders to whom SORNA did not apply without specification is clear: "sex offenders convicted before the enactment of this Act or its implementation in a particular jurisdiction." The second clause of subsection (d) gives the Attorney General authority to make rules for these offenders "and for other categories of sex offenders" unable to register initially. The latter phrase does not create ambiguity—"other" categories of sex offenders unable to comply with the initial registration requirements are logically distinct from the offenders convicted before SORNA's implementation. They consist of offenders convicted after SORNA's full implementation who are nonetheless somehow unable to comply with its initial registration requirements.

**B. "Other"**

"[O]ther categories of sex offenders who are unable to comply with subsection (b)" does not most naturally mean "other categories of sex offenders who are *also* unable to comply with subsection (b)." *But see Hinckley*, 550 F.3d at 929-35; *id.* at 940-49 (Gorsuch, J., concurring); *May*, 535 F.3d at 916-19. Nothing in the context of subsection (d) requires such a reading, while that addition to the text would alter the plain language that Congress enacted.

For "other" to change the meaning of a preceding clause, context would have to make it obvious that such was the intent. Consider a sign reading: "Knives and guns are prohibited within. You may check these items and other categories of dangerous weapon at the front desk." The plain meaning of the text bans any knife or gun, no matter how dangerous. In some contexts, perhaps one would know not to read the sign literally—one would hardly expect a hotel or restaurant to ban butter knives from the premises, suggesting that notwithstanding the inartful drafting the concern is with dangerous knives. But the literal language of the sign makes perfect sense absent such a contextual clue. The argument for "other" changing the meaning of "sex offenders convicted before the enactment of this Act" is akin to an argument that the no-knives-

and-guns sign would allow the carrying of a realistic-looking but disabled gun into a bank or airport.

Similarly, "other categories of sex offenders who are unable to comply with subsection (b)" logically means a set of offenders who are unable to comply with the initial registration requirements after SORNA's implementation, distinct from the set of offenders convicted before SORNA's enactment.

Nothing in the context of the statute requires a nonliteral reading that limits the first clause of subsection 16913(d) to offenders unable to register initially. In enacting SORNA, Congress desired a uniform nationwide sex offender registry, but also had to take into account local variation in existing state registration schemes. Congress had to balance the desire for universal coverage with the added administrative burdens on state governments. The literal scheme created by the statute is not inherently irrational. Congress required immediate registration of all sex offenders convicted after SORNA, required the Attorney General to make rules for any offenders somehow not able to register with their jurisdiction despite SORNA's implementation, and allowed the Attorney General to determine to what degree SORNA's requirements should apply to offenders convicted before SORNA as well as what registration rules should apply to them. By doing so, Congress gave the Attorney General flexibility in implementing SORNA, particularly flexibility with respect to the enormous backlog of sex offenders whose registrations were incomplete under the new federal standards. Nothing in the structure or content of the SORNA statute suggests that Congress could not have intended to delegate such authority to the Attorney General.

## C.  Title of § 16913(d)

Some courts that have limited subsection (d) to offenders unable to register initially have done so after considering the subsection's title, "Initial registration of sex offenders unable to comply with subsection (b)." *See Hinckley*, 550 F.3d at 934; *May*, 535 F.3d at 918. However, considering the title is not appropriate unless the statute is ambiguous. *See INS v. St. Cyr*, 533 U.S. 289, 308-09 (2001); *Bhd. of R.R. Trainmen v. Balt. & O.R. Co.*, 331 U.S. 519, 528-29 (1947); *CDI Info. Servs., Inc. v. Reno*, 278 F.3d

616, 619 (6th Cir. 2002).  Subsection (d) is not ambiguous, so its title makes no difference.  But even if subsection (d) were ambiguous, the title does not conflict with our reading of the text.  The title refers to the authority given to the Attorney General by the second clause of subsection (d), authority to set registration rules for offenders unable to comply with the initial registration requirements.  But the title does not refer to the authority given by the first clause, authority to "specify the applicability of the requirements" of SORNA to certain offenders.  Nothing in the title is inconsistent with the literal reading of the statute, nor is the limited nature of the title especially significant.

> That the heading of [a section] fails to refer to all the matters which the framers of that section wrote into the text is not an unusual fact.  That heading is but a short-hand reference to the general subject matter involved.  While accurately referring to [certain subjects], it neglects to reveal that [the section] also deals with [other subjects].  But headings and titles are not meant to take the place of the detailed provisions of the text.  Nor are they necessarily designed to be a reference guide or a synopsis.  Where the text is complicated and prolific, headings and titles can do no more than indicate the provisions in a most general manner; to attempt to refer to each specific provision would often be ungainly as well as useless.  As a result, matters in the text which deviate from those falling within the general pattern are frequently unreflected in the headings and titles.

*Bhd. of R.R. Trainmen*, 331 U.S. at 528.

## D.  Relation to § 16901

Some judges who have decided that § 16913(d)'s purported ambiguity cuts in favor of the Government have also relied on another section of SORNA, 42 U.S.C. § 16901, with which the plain meaning of § 16913(d) purportedly conflicts.  *See Hatcher*, 560 F.3d at 231-33 (Shedd, J., dissenting); *Hinckley*, 550 F.3d at 932-33; *id.* at 943-46 (Gorsuch, J., concurring).

Section 16901 states that SORNA creates a "comprehensive national system" to register sex offenders.  Reading § 16913(d) literally does not undermine this statement.  The broad general goal of the legislation stated in an introductory section does not

overcome the specific language in later sections defining how the "comprehensive" system is to be created. *See Long Island Care at Home, Ltd. v. Coke*, 551 U.S. 158, 170 (2007); *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 384 (1992). Congress employed language specifying that SORNA could apply to all sex offenders, but that the Attorney General would specify when offenders with past convictions and offenders convicted before the states fully implement SORNA would be required to register. Such a system enables the Attorney General to balance administrative constraints with the goal of complete coverage. That the Attorney General has opted to require full coverage now does not prove that Congress did not want the Attorney General to have the flexibility to relax SORNA's requirements on some sex offenders if states had (or began having) difficulty fully implementing its requirements. Moreover, the related argument that SORNA is not comprehensive because an Attorney General might not require any pre-SORNA offenders to register[5] disregards the political reality that an Attorney General was unlikely to do so.

## E. Ambiguity

In any event, if § 16913(d) were ambiguous, that ambiguity should work in the defendant's favor. "When ambiguity clouds the meaning of a criminal statute, 'the tie must to go the defendant.'" *United States v. Ford*, 560 F.3d 420, 425 (6th Cir. 2009) (quoting *United States v. Santos*, 128 S. Ct. 2020, 2025 (2008) (plurality opinion)). It is true that the tie does not go to the defendant if "'traditional canons of statutory construction'" can resolve the ambiguity. *See United States v. Angwin*, 560 F.3d 549, 553 (6th Cir. 2009) (quoting *United States v. Hayes*, 129 S. Ct. 1079, 1089 (2009)). But here those interpretative canons already point toward the plain meaning.

Even if § 16913(d) were ambiguous, the tools of statutory interpretation, including examining the title and context of the subsection, would not require interpreting the statute in the manner favored by the Government. Thus, if SORNA were

---

[5]*See, e.g.*, *Hatcher*, 560 F.3d at 233 (Shedd, J., dissenting); *Hinckley*, 550 F.3d at 945 (Gorsuch, J., concurring).

ambiguous, the court would be required to resolve that ambiguity in favor of the defendant.

## F.  Legislative History

Moreover, the legislative history of SORNA does not provide much support for a different construction even if § 16913(d) were ambiguous.  House Bill 4472, which eventually became Public Law 109-248, contained the text enacted into subsection (d) when it passed the House, but had no accompanying committee reports.  H.R. 4472, 109th Cong. § 113 (2006).  Chairman Sensenbrenner, who introduced House Bill 4472, had earlier introduced a version of SORNA in House Bill 3132.  That bill contained a provision parallel to what is now subsection (d) that stated "[t]he Attorney General shall prescribe a method for the registration of sex offenders convicted before the enactment of this Act."  H.R. 3132, 109th Cong. § 113 (2005).  And after the House Judiciary Committee marked up the bill without amending that subsection, that Committee issued a report stating that "[t]he Attorney General is authorized to issue guidelines on application of the Act to sex offenders who were not previously covered by the sex offender registration requirements."  H.R. Rep. No. 109-218, pt. 1, at 45 (2005).  This earlier draft of the House legislation appeared to contemplate that the Attorney General would regulate the registration of offenders convicted before SORNA, though it can be read as automatically requiring such offenders to register.

Meanwhile, the Senate also worked on SORNA legislation.  Senator Hatch introduced Senate Bill 1086, which paralleled the earliest comprehensive SORNA bill.  After the Senate Judiciary Committee marked up Senate Bill 1086, it contained the following provisions:

> (8) RETROACTIVE APPLICATION- The Attorney General shall have the authority to--
>
> (A) specify the applicability of the requirements of this title to individuals who are covered individuals based on a conviction or sentencing that occurred prior to the date of enactment or who are, as of the date of enactment of this Act, incarcerated or under a non-incarcerative sentence for some other offense;

(B) specify the applicability of the requirements of this title to all other individuals who are covered individuals based on a conviction or sentencing that occurred prior to the enactment date of enactment of this Act or the implementation of the requirements of this title by a participating State; and

(C) specify procedures and methods for the registration of individuals to whom the requirements of this title apply pursuant to subparagraph (A) or (B).

S. 1086, 109th Cong. § 104(a)(8) (2005).

These provisions, which would have unambiguously given the Attorney General the authority to specify SORNA's requirements for offenders convicted pre-SORNA, closely parallel the language that became subsection (d). Subsection (B) of the quoted portion of Senate Bill 1086 parallels the first clause of § 16913(d), giving the Attorney General the authority to determine the application of SORNA, and subsection (C) parallels the second clause of § 16913(d), giving the Attorney General the authority to make rules to register offenders convicted pre-SORNA. Subsection 16913(d) reads like a revised version of this provision of Senate Bill 1086, suggesting that Congress did not intend any substantive change between those provisions.

Divining anything from unenacted legislation is always a risky business. But this is not a case in which Congress has replaced an unambiguous phrasing with an ambiguous one—rather, Congress appears to have substituted for one unambiguous section a substantively similar section that, while not free from awkwardness, is unambiguous. A statute may be "awkward, and even ungrammatical; but that does not make it ambiguous on the point at issue." *Lamie v. U.S. Tr.*, 540 U.S. 526, 534 (2004). Even if considering the legislative history were necessary, it would support the literal reading of § 16913(d).

Isolated statements by members of Congress do not compel a nonliteral reading of § 16913(d). "[T]he statements of individual legislators . . . during the course of the enactment process" may not "expand[] or contract[]" legislation when "the statutory text adopted by both Houses of Congress and submitted to the President" is "unambiguous." *W. Va. Univ. Hosps., Inc. v. Casey*, 499 U.S. 83, 98-99 (1991).

In any event, the statements cited by some judges in this regard do not establish that any member of Congress did not intend the literal meaning of § 16913(d). *See Hinckley*, 550 F.3d at 947 (Gorsuch, J., concurring); *United States v. Hinen*, 487 F. Supp. 2d 747, 753 n.5 (W.D. Va. 2007), *rev'd sub nom. United States v. Hatcher*, 560 F.3d 222 (4th Cir. 2009). The statements may show that "the bill's sponsors consistently and emphatically expressed displeasure with the existing state-by-state patchwork of sex offender laws and stated their intention to replace them with a uniform, comprehensive federal registration statute." *Hinckley*, 550 F.3d at 947 (Gorsuch, J., concurring). But that does not show that the legislators did not intend to reach their goal through the means specified in the statute—regulatory application of the comprehensive federal registration statute to past offenders. That legislators expressly sought coverage of the "approximately 500,000 sex offenders registered under various and patchwork state regimes at the time of the bill's enactment," *id.*, likewise does not show that they expected such coverage to occur automatically by the statute rather than, as the statutory text provides, by the Attorney General's regulation.

Moreover, interpreting legislative statements in the narrow context of the criminal penalties for failure to register overlooks the broader scope of SORNA. In addition to making a federal crime out of failure to register, SORNA also increases sex offender registration by enlisting the cooperation of the states. For instance, SORNA encourages states to enact criminal penalties of more than a year in prison for sex offenders who do not comply with SORNA's registration requirements. 42 U.S.C. § 16913(e). SORNA encourages states to maintain a sex offender registry that conforms to SORNA's requirements, *id.* § 16912(a), and directs the Attorney General to incorporate the states' information into a national registry, *id.* § 16919(a). The legislators' statements mentioned above might just as easily refer to those provisions of SORNA. Indeed, it appears from the text of the statute that if every state cooperates (rather than losing 10% of certain federal grants, *see id.* § 16925(a)), SORNA would create a comprehensive national sex offender registry even if the Attorney General never applied the criminal provisions of § 2250 to pre-SORNA offenders. And these and other provisions of SORNA unambiguously anticipate that regulation will be required for

implementation.  *See id.* §§ 16912(b); 16915a; 16915b(a)(1); 16917(b); *see also id.* § 16914(b)(8).

Even if § 16913(d) were ambiguous enough that considering its legislative history were appropriate, that legislative history would not compel a narrower reading. Nothing in the legislative history is inconsistent with the statute's unambiguous text.

## G.  Conclusion

SORNA unambiguously delegated to the Attorney General the authority to determine whether SORNA applies to Cain.  Thus, under the clear language of the statute Cain could not be indicted for failure to update his registration in the absence of the regulation.

## IV.  APA Requirements for Effectiveness of a Regulation

The Attorney General's regulation could not take immediate legal effect for Cain because the Department of Justice did not provide good cause to dispense with notice and comment or with the thirty-day waiting period, both required by the Administrative Procedure Act.  The Attorney General stated that he would accept comments on the "emergency" regulation through April 30, 2007.  *See* Applicability of the Sex Offender Registration and Notification Act, 72 Fed. Reg. 8894, 8895 (published Feb. 28, 2007). Cain's indictment covered a period ending on March 28, 2007, less than thirty days after promulgation of the regulation, and a month before the close of the comment period. The Attorney General's twofold failure to comply with the APA means that Cain was not subject to the regulation during the period covered by his indictment.

## A.  Notice and Comment

The APA states that notice of proposed rulemaking "shall be published in the Federal Register," 5 U.S.C. § 553(b), and that the agency "shall give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments," *id.* § 553(c).  The purpose of the notice and comment provision is so that agencies will receive public input, enabling them to craft a better rule than they

otherwise could. "[T]he primary purpose of Congress in imposing notice and comment requirements for rulemaking" is "to get public input so as to get the wisest rules." *Dismas Charities, Inc. v. U.S. Dep't of Justice*, 401 F.3d 666, 680 (6th Cir. 2005).

In addition to increasing the quality of rules, the required public participation helps "ensure fair treatment for persons to be affected by" regulation. *Id.* at 678. This "chance to participate" is "one of the central purposes" of the notice and comment requirement. *Id.* Hence the statutory design to "ensure that affected parties" may participate in decision making "at an early stage." *Id.* (quotation omitted). Fairer and wiser rules result from the APA-required "mature consideration." *See id.* (quotation omitted).

Because the Attorney General's specification puts new criminal liability on the acts or omissions of regulated persons, it is quintessentially legislative, as compared with regulations that merely restate or interpret statutory obligations. This contrasts with interpretive rules, not subject to notice and comment requirements. *See* 5 U.S.C. § 553(b)(A). The Attorney General does not claim under § 553(b)(A) to be merely "explicating Congress'[s] desires" rather than "adding substantive content of [his] own." *See Dismas Charities*, 401 F.3d at 680 (quotation omitted). Rather, the regulation at issue is a substantive rule that "make[s]" or "create[s] law." *See id.* at 679 (quotations omitted). And when an agency acts in this legislative capacity, Congress generally requires the agency to follow the quasi-legislative notice and comment procedures of the APA.

The Attorney General concedes here that he did not follow these procedures. He attempts to justify this omission under the "public interest" prong of the other notice and comment exception. Subsection 553(b)(B) excuses notice and comment "when the agency for good cause finds (and incorporates the finding and a brief statement of reasons therefor in the rules issued) that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest." However, the Government's burden to show that good cause exists is a heavy one—the good cause exception is "'narrowly construed and only reluctantly countenanced.'" *Util. Solid*

*Waste Activities Group v. EPA*, 236 F.3d 749, 754 (D.C. Cir. 2001) (quoting *Tenn. Gas Pipeline Co. v. FERC*, 969 F.2d 1141, 1144 (D.C. Cir. 1992)).  The proffered reasons do not meet this standard.

The Attorney General argued that forgoing notice and comment was "necessary to eliminate any possible uncertainty" about the application of SORNA. But a desire to provide guidance to regulated parties is not sufficient to show good cause to bypass the notice and comment provisions of the APA.  A "desire to provide immediate guidance, without more, does not suffice for good cause." *Mobil Oil Corp. v. Dep't of Energy*, 610 F.2d 796, 803 (Temp. Emer. Ct. App. 1979); *see Zhang v. Slattery*, 55 F.3d 732, 746-47 (2d Cir. 1995), *abrogated on other grounds by statute*, 8 U.S.C. § 1101(a)(42). "[G]ood cause to suspend notice and comment must be supported by more than the bare need to have regulations." *Nat'l Ass'n of Farmworkers Orgs. v. Marshall*, 628 F.2d 604, 621 (D.C. Cir. 1980).  Otherwise the good cause exception would swallow the rule. *Mobil Oil*, 610 F.2d at 803.  In any event, the "elimination of uncertainty" argument misses the mark for two additional reasons.  When Congress enacted SORNA, it elected both to delegate regulatory authority to the Attorney General and to decline to bypass the APA's requirements, with the natural consequence that some period of uncertainty would follow while the Attorney General conducted regulatory procedures.  And the Attorney General himself gave no explanation for his own seven-month delay in issuing regulations, which doubtless significantly contributed to any uncertainty.

The same considerations undercut the Attorney General's statements about "delay." By delegating regulatory authority to the Attorney General rather than creating law itself, Congress created a period of delay at least long enough for the Attorney General to promulgate his specification.  By leaving the APA's requirements regarding the creation of those regulations intact, Congress implicitly added to that period of delay. Congress had thus already balanced the costs and benefits of an immediately effective rule compared to the delayed implementation of a reasoned regulation.  The conclusory speculative harms the Attorney General cites are  not sufficient to upset this balance.

This situation stands in contrast to a situation where an agency faces a statutory deadline. For instance, in *Republic Steel Corp. v. Costle*, we held that an agency had good cause to act without notice and comment. *See* 621 F.2d 797, 803-04 (6th Cir. 1980). In *Costle*, though, the agency faced, among other things, a congressionally imposed deadline for action, rendering advance notice and comment "impracticable." *Id.* at 803. A deadline imposed by Congress before which an agency must regulate may support a finding of good cause, which makes sense because Congress can implicitly set aside the APA when it specifically requires rapid action. *See, e.g.*, *Petry v. Block*, 737 F.2d 1193, 1200-03 (D.C. Cir. 1984); *Am. Transfer & Storage Co. v. ICC*, 719 F.2d 1283, 1292-97 (5th Cir. 1983); *cf. Nat'l Customs Brokers & Forwarders Ass'n of Am., Inc. v. United States*, 59 F.3d 1219, 1222-24 (Fed. Cir. 1995) (noting that good cause existed when Congress had directed agency to change limit in regulation to specified level). An agency may also be able, without public participation, to set aside a deadline that it had imposed on itself through full rulemaking if other factors show that meeting the deadline is impracticable despite the agency's best efforts. *Council of the S. Mountains, Inc. v. Donovan*, 653 F.2d 573, 581-82 (D.C. Cir. 1981). But even a statutory deadline may not be enough to establish good cause to disregard APA requirements if the agency would have had time for notice and comment had it not unreasonably delayed taking action. *See W. Oil & Gas Ass'n v. EPA*, 633 F.2d 803, 812 (9th Cir. 1980). Here the Attorney General faced no statutory or regulatory deadline regarding regulating under § 16913(d), so that possible exception is of no help to him.

SORNA retroactivity also does not present the type of safety emergency that some courts have relied upon to find just cause to bypass notice and comment. Notice and comment may be "impracticable" when "a safety investigation shows that a new safety rule must be put in place immediately." *Util. Solid Waste Activities Group v. EPA*, 236 F.3d 749, 754-55 (D.C. Cir. 2001) (citation omitted). But this consideration has been used for dispensing with notice and comment when the emergency arose *after* the statutory enactment at issue. For instance, when seven helicopter accidents involving four deaths occurred in the first nine months of 1994, the Federal Aviation Administration had good cause in September 1994 to issue an emergency regulation

aimed at the problem without first providing for notice and comment. *Haw. Helicopter Operators Ass'n v. FAA*, 51 F.3d 212, 214 (9th Cir. 1995). But there the agency cited the specific accident record that prompted it to take action to change the existing background of regulations, including an accident three weeks before promulgation of the regulation. *Id.* The agency had specific reasons to conclude that its existing regulations insufficiently protected public safety, and those reasons arose after the existing regulations went into effect—thus, the reasons justified issuing an emergency regulation. In contrast, here the Attorney General gave no specific evidence of actual harm to the public in his conclusory statement of reasons, and gave no explanation for why he could act in an emergency fashion when Congress had not deemed the situation so critical seven months earlier.

We recognize that the only other circuit to consider whether the Attorney General's regulation complies with the APA rejected the defendant's APA challenge. *See United States v. Gould*, 568 F.3d 459, 469-70 (4th Cir. 2009). But that court's brief analysis offered only three weak reasons for its holding. The Fourth Circuit claimed a need for legal certainty about the application of SORNA, claimed that delay "could reasonably be found to put the public safety at greater risk," and (incorrectly) claimed that the Attorney General eventually accepted comments on the regulation. *Id.* at 470. As already explained, these reasons, whether individually or in combination, do not show good cause to disregard the APA. The Fourth Circuit's cursory rejection of the APA challenge drew a lengthy dissent that explained the errors of the majority's analysis, *see id.* at 475-82 (Michael, J., dissenting), but the majority opinion did not respond to the dissent. In our view, that dissent properly applied the APA.

The fact that the regulation imposes a new obligation, on pain of severe criminal sanctions, only reinforces the need for the statutory protections in place when an agency engages in quasi-legislation. We agree with the D.C. Circuit's statement, in the course of reversing a conviction under a regulation, that "[c]ertainly, a criminal prosecution founded on an agency rule should be held to the strict letter of the APA." *United States v. Picciotto*, 875 F.2d 345, 346 (D.C. Cir. 1989). The Attorney General has not provided

reasons sufficient to establish that he had good cause to disregard the APA's notice and comment requirements, so Cain's criminal conviction cannot stand.[6]

## B. Thirty-Day Waiting Period

Moreover, the regulation could not take immediate legal effect because the Attorney General did not comply with the APA's requirement of thirty-day advance publication.

The APA requires that a "substantive rule" must be published "not less than 30 days before its effective date." 5 U.S.C. § 553(d). When an agency fails to follow this requirement, its regulations have no effect on anyone who did not receive actual and timely notice. *Id.* § 552(a)(1). Publication of "substantive rules of general applicability," *id.* § 552(a)(1)(D), is required "for the guidance of the public," *id.* § 552(a)(1). This public notice gives persons affected by the change in the law time to prepare to comply with the new rule. *See Riverbend Farms, Inc. v. Madigan*, 958 F.2d 1479, 1485 (9th Cir. 1992) (holding that the purpose is "to give affected parties time to adjust their behavior before the final rule takes effect"). Notice is nowhere more important than in the criminal law, where individual liberty is at stake. As the Eighth Circuit has noted,

> [i]n determining whether the good cause exception is to be invoked, an administrative agency is required to balance the necessity for immediate implementation against principles of fundamental fairness which require that all affected persons be afforded a reasonable time to prepare for the effective date of its ruling. When the consequence of agency rule making is to make previously lawful conduct unlawful and to impose criminal sanctions, the balance of these competing policies imposes a heavy burden upon the agency to show public necessity.

*United States v. Gavrilovic*, 551 F.2d 1099, 1105 (8th Cir. 1977).

The Attorney General did not provide thirty days of notice in advance of the purported effective date of the regulation applying SORNA to pre-SORNA offenders.

---

[6]We take no position on whether a conviction based on failure to register after the close of the comment period would be invalid, as that issue is not before us.

He attempts to justify this lack of compliance with the thirty-day requirement under the exception in § 553(d)(3), which excuses the notice requirement "for good cause found and published with the rule." The Attorney General's statement of reasons is largely inadequate for reasons similar to those discussed in the previous section. Although we recognize that the good cause exceptions are different and one may be met even if the other is not, *see Am. Fed'n of Gov't Employees v. Block*, 655 F.2d 1153, 1156 (D.C. Cir. 1981); *W. Oil*, 633 F.2d at 811-12, the Attorney General's statement did not distinguish between its proffered reasons to dispense with public participation and its reasons to dispense with advance notice.

The statement of reasons with respect to advance notice is particularly inadequate for a regulation that increases criminal penalties. Many sex offenders (including Cain) would violate state law by failing to update registrations in March 2007; the Attorney General does not explain what sex offenses the increased penalties of § 2250 might deter that preexisting state and federal law would not deter during this period. On the other hand, sex offenders made subject to § 2250 face serious criminal penalties. The Government's position would make sex offenders such as Cain without warning suddenly subject to the harsher penalties, instead of increasing the pressure on them to register.

We are aware of no case, other than *Gould*, in which a circuit court has upheld a criminal conviction based on a regulation promulgated without thirty days' advance notice. Even civil cases that have upheld exceptions under § 553(d)(3) are easily distinguished. For instance, the *Riverbend Farms* court excused the agency from thirty-day advance publication because the record demonstrated that in the navel orange regulatory system accurate predictions of weekly volume restrictions that far in advance were impossible. 958 F.2d at 1485-86. There was no such impossibility in this case.

Cain's indictment charges failure to keep his registration updated for a period ending March 28, 2007, while the regulation could not take effect for thirty days after

its publication on February 28, 2007. Thus, Cain was not subject to the criminal penalties of § 2250 at the times charged in his indictment.[7]

The failure to allow advance public participation and the failure to give advance notice thus each independently gives reason to vacate Cain's conviction.

## V.  Conclusion

SORNA requires the Attorney General to issue regulations specifying its application before a sex offender convicted before its enactment may be subjected to criminal prosecution for failure to keep his registration current. Because the Attorney General did not issue such a regulation in compliance with the notice and comment and publication requirements of the APA within the time period charged in Cain's indictment, the indictment must be dismissed. We therefore vacate Cain's conviction and remand to the district court with instructions to grant the motion to dismiss the indictment.

---

[7]We take no position on whether the same would be true for a defendant who failed to register during a period more than thirty days after publication of the regulation.

---

**DISSENT**

---

GRIFFIN, Circuit Judge, dissenting.  The Adam Walsh Child Protection and Safety Act of 2006, Pub. L. No. 109-248, 120 Stat. 587 (2006), was signed into law on July 27, 2006, by President George W. Bush and given immediate effect.  Title 1 of the Walsh Act is the Sex Offender Registration and Notification Act, commonly referred to as "SORNA," which creates a federal felony for the interstate travel of convicted sex offenders subject to the Act who knowingly fail to register or update their registrations, 18 U.S.C. § 2250.  The declared Congressional purpose of SORNA is broad:

> In order to protect the public from sex offenders and offenders against children, and in response to the vicious attacks by violent predators against the victims listed below, Congress in this chapter establishes a comprehensive national system for the registration of those offenders.

42 U.S.C. § 16901.  Section 16911(1) of SORNA defines "sex offender" in the past tense:  "The term 'sex offender' means an individual who *was* convicted of a sex offense."  42 U.S.C. § 16911(1) (emphasis added).

Defendant Marcus Cain is a sex offender based on his 1998 Ohio conviction for attempted rape.  As a convicted sex offender, Cain was required by Ohio law to register with the State for a period of ten years and to verify annually his current address.  He complied until July 2006, when Cain notified his parole officer that he was moving to Georgia.  Because of his proposed change of address, Cain was instructed to register in Georgia and also to notify the Summit County, Ohio, sheriff's office of his intent to move.  He did neither.  His last contact with the Ohio parole officer was on September 18, 2006.  Thereafter, Cain moved to Georgia and did not appear at an October 16, 2006, scheduled registration in Ohio.  In March 2007, he was arrested in Georgia on a warrant from Summit County and charged with failure to verify his current address.  The state case was dismissed, but Cain was subsequently indicted by a federal grand jury for failing to comply with SORNA's sex offender registration requirements.  Cain conditionally pled guilty to violating 18 U.S.C. § 2250 by traveling in interstate

commerce "from on or about October 16, 2006, through on or about March 28, 2007" but failing to update his previous sex offender registration. In his plea agreement, Cain reserved the right to appeal the district court's denial of his motion to dismiss the indictment. This appeal ensued.

The majority holds that Cain was not subject to SORNA's requirements during the period set forth in the indictment and, therefore, his conviction must be reversed. I disagree and respectfully dissent. The majority's construction of SORNA is inconsistent with the language of the statute when viewed in context. I would hold that SORNA applies to Cain, a pre-SORNA registered sex offender whose SORNA violation indisputably occurred after the effective date of the Act, July 27, 2006. Accordingly, I would affirm his conviction.

I.

The first issue regards the registry requirement for sex offenders set forth in 42 U.S.C. § 16913. This section of SORNA provides, in full, the following:

### § 16913.  Registry requirements for sex offenders

**(a)  In general**

A sex offender *shall* register, and keep the registration current, in each jurisdiction where the offender resides, where the offender is an employee, and where the offender is a student. For initial registration purposes only, a sex offender *shall* also register in the jurisdiction in which convicted if such jurisdiction is different from the jurisdiction of residence.

**(b)  Initial registration**

The sex offender *shall* initially register –

(1)  before completing a sentence of imprisonment with respect to the offense giving rise to the registration requirement; or

(2)  not later than 3 business days after being sentenced for that offense, if the sex offender is not sentenced to a term of imprisonment.

**(c)  Keeping the registration current**

A sex offender *shall*, not later than 3 business days after each change of name, residence, employment, or student status, appear in person in at least 1 jurisdiction involved pursuant to subsection (a) of this section and inform that jurisdiction of all changes in the information required for that offender in the sex offender registry.  That jurisdiction *shall* immediately provide that information to all other jurisdictions in which the offender is required to register.

**(d)  Initial registration of sex offenders unable to comply with subsection (b) of this section**

The Attorney General *shall have the authority* to specify the applicability of the requirements of this subchapter to sex offenders convicted before July 27, 2006 or its implementation in a particular jurisdiction, and to prescribe rules for the registration of any such sex offenders and for other categories of sex offenders who are unable to comply with subsection (b) of this section.

**(e)  State penalty for failure to comply**

Each jurisdiction, other than a Federally recognized Indian tribe, *shall* provide a criminal penalty that includes a maximum term of imprisonment that is greater than 1 year for the failure of a sex offender to comply with the requirements of this subchapter.

(Emphasis added.)

II.

Recently, in *Thompson v. North Am. Stainless, LP*, 567 F.3d 804, 807 (6th Cir. 2009) (en banc), we set forth the following fundamental principles of statutory construction:

> When we, in turn, are called upon to review and interpret Congress's legislation, "[i]t is elementary that the meaning of a statute must, in the first instance, be sought in the language in which the act is framed, and if that is plain, and if the law is within the constitutional authority of the lawmaking body which passed it, the sole function of the courts is to enforce it according to its terms." *Caminetti v. United States*, 242 U.S. 470 (1917).  "If the words are plain, they give meaning to the act, and it is neither the duty nor the privilege of the courts to enter speculative fields in search of a different meaning." *Id.* at 490.  Recognizing the consequences of unbridled judicial forays into the legislative sphere, the Supreme Court has admonished "'time and again that a legislature says

in a statute what it means and means in a statute what it says there.'" *Arlington Cent. Sch. Dist. Bd. of Ed. v. Murphy*, 548 U.S. 291, 296 (2006) (quoting *Connecticut Nat'l Bank v. Germain*, 503 U.S. 249, 112 S. Ct. 1146, 117 L. Ed. 2d 391 (1992)). Accordingly, "[w]hen the statutory language is plain, the sole function of the courts – at least where the disposition required by the text is not absurd – is to enforce it according to its terms." *Id.* (internal citations and quotation marks omitted). *See also Robinson v. Shell Oil Co.*, 519 U.S. 337, 340 (1997) ("[The courts'] inquiry must cease if the statutory language is unambiguous and the statutory scheme is coherent and consistent.") (internal citation and quotation marks omitted); *Rubin v. United States*, 449 U.S. 424, 430 (1981) ("When we find the terms of a statute unambiguous, judicial inquiry is complete, except in rare and exceptional circumstances.").

Statutory construction is a "holistic endeavor" based upon the text of the entire statute. As the Supreme Court explained in *United Savings Ass'n of Texas v. Timbers of Inwood Forest Assoc.*, *Ltd.*, 484 U.S. 365 (1988):

> [V]iewed in the isolated context of § 362(d)(1), the phrase could reasonably be given the meaning petitioner asserts. Statutory construction, however, is a holistic endeavor. A provision that may seem ambiguous in isolation is often clarified by the remainder of the statutory scheme – because the same terminology is used elsewhere in a context that makes its meaning clear, or because only one of the permissible meanings produces a substantive effect that is compatible with the rest of the law.

*Id.* at 371 (citations omitted).

### III.

On February 28, 2007, seven months after SORNA was enacted, the Attorney General issued an interim rule determining that "[t]he requirements of the Sex Offender Registration and Notification Act apply to all sex offenders, including sex offenders convicted of the offense for which registration is required prior to the enactment of that Act." 28 C.F.R. § 72.3 (2007).

Section § 16913 of SORNA, particularly subsection (d), has opened a judicial Pandora's Box. Since SORNA was enacted, litigation regarding its construction, constitutionality and retroactive application has proliferated – without a consistent

mandate from the courts. As one court has aptly observed, "[t]he courts cannot agree on the meaning of § 16913, or even whether it is ambiguous." *United States v. Zuniga*, No. 4:07CR3156, 2008 WL 2184118, at *10 (D. Neb. May 23, 2008) (unpublished). As a result, a body of case law has developed that is comprised of irreconcilable interpretations of § 16913: "Some courts have held that SORNA is retroactive as of its effective date for defendants convicted of a sex offense before the effective date and already required to register when moving to another state[;] . . . other courts have interpreted this provision to mean that SORNA could not be applied retroactively to those convicted of sex offenses before its enactment until after the Attorney General issued a ruling to that effect (which was done on February 28, 2007)[;] [and] some courts have held that SORNA's criminal sanctions applied to those who traveled in interstate commerce before the effective date of SORNA, while others held that they did not." *See* Tracy Bateman Farrell, Annotation, *Validity, Construction, and Application of Federal Sex Offender Registration and Notification Act (SORNA), 42 U.S.C. §§ 16901 et seq., its Enforcement Provision, 18 U.S.C.A. § 2250, and Associated Regulations*, 30 A.L.R. FED. 2d 213, § 2 (2008) (collecting SORNA-related decisions).

In the present case, the majority holds that the Adam Walsh Child Protection and Safety Act and its SORNA provision affords previously convicted sex offenders a grace period to travel in interstate commerce without registering as sex offenders or updating their registration until such time as the Attorney General promulgates valid rules under the Act. The majority's specific holding is as follows:

> SORNA requires the Attorney General to issue regulations specifying its application before a sex offender convicted before its enactment may be subjected to criminal prosecution for failure to keep his registration current. Because the Attorney General did not issue such a regulation in compliance with the notice and comment and publication requirements of the APA within the time period charged in Cain's indictment, the indictment must be dismissed.

I disagree and would hold that, in regard to the obligations of registered sex offenders whose convictions pre-date SORNA, the requirements of the statute were immediately effective upon the date of its enactment.

Without citation to authority, the majority concludes that the first clause of § 16913(d) "*requires*" the Attorney General to promulgate rules pertaining to sex offenders who were convicted before the effective date of the Act. The majority relies on the "*shall have the authority*" language of subsection (d). In my view, the "shall have the authority" language is clearly permissive, not mandatory. Congress knows how to mandate the promulgation of rules and regulations and, in fact, did so in the previous section of SORNA, which provides:

### § 16912.  Registry requirements for jurisdictions

### (a)  Jurisdiction to maintain a registry

Each jurisdiction shall maintain a jurisdiction-wide sex offender registry conforming to the requirements of this subchapter.

### (b)  Guidelines and regulations

The Attorney General *shall issue guidelines and regulations* to interpret and implement this subchapter.

42 U.S.C. § 16912 (emphasis added).[1]

In contrast to § 16912(b), the language of § 16913(d) is not that the Attorney General "*shall issue*," but rather "*shall have the authority*."[2] Having the power or authority to act does not require the exercise of such authority. The United States properly recognizes this distinction in its appellate brief: "Furthermore, the express language of the statute [§ 16913(d)] did not require the Attorney General to act but simply gave him the authority to do so." This interpretation of SORNA conforms to the view adopted by all courts that have construed similar language.

---

[1]The Attorney General complied with the mandate of § 16912(b). *See Proposed Guidelines to Interpret and Implement the Sex Offender Registration and Notification Act*, 72 Fed. Reg. 30210 (May 30, 2007), and the *Final Guidelines to Interpret and Implement the Sex Offender Registration and Notification Act,* 73 Fed. Reg. 38030 (July 2, 2008).

[2]The Eleventh Circuit Court of Appeals, in *United States v. Madera*, 528 F.3d 852, 857 (11th Cir. 2008), cited favorably by the majority in this case, failed to make this critical distinction when it held that "Congress's use of the word 'shall' [in § 16913(d)] indicates that Congress was issuing a directive to the Attorney General specifically to make the determination. . . . Congress's use of the word 'shall' means that the one commanded must follow the command." (citation and internal quotation marks omitted).

For instance, in *NLRB v. Barrett Co.*, 120 F.2d 583 (7th Cir. 1941), the Court of Appeals for the Seventh Circuit held that Section 10(b) of the National Labor Relations Act, 29 U.S.C. § 160(b), which provides that when an unfair labor practice is charged the National Labor Relations Board "shall have power to issue" a complaint, is discretionary, not mandatory:

> Section 10(b) does not require the Board to issue a complaint. It expressly provides that the Board "shall have power to issue and caused to be served * * * a complaint stating the charges in that respect * * *." "Power to issue" is different from "shall issue." The difference is important. In one the Board's duty is mandatory. It has no discretion. In the other, the Board has a discretion – it acts judicially. It is in the exercise of this discretionary power, that investigation becomes necessary. The power to investigate is a necessary power, which is incidental to the exercise of the power to issue a complaint.

*Barrett Co.*, 120 F.2d at 586.

Similarly, in *Kennedy v. Block*, 606 F. Supp. 1397 (W.D. Va. 1985), vacated on other grounds, 784 F.2d 1220 (4th Cir. 1986), the court held that Section 510(g) of the National Housing Act of 1949, as amended, 42 U.S.C. § 1480(g), governing the termination of subsidized housing assistance, did not require the Farmers Home Administration ("FmHA") to follow certain procedures in the course of an eviction:

> The court must look initially to the language of the statute to determine whether Congress intended the requirements of 42 U.S.C. § 1480(g) to be mandatory. The statute is worded as follows: "In carrying out the provisions of this subchapter, *the Secretary shall have the power to –* (g) issue rules and regulations [providing procedural safeguards to tenants facing eviction] . . . ." 42 U.S.C. § 1480(g) (emphasis added). The statute is not in the mandatory language which would substantiate a claim that Congress meant to require FmHA to implement the contents of paragraph (g). Instead the language represents only a grant of rulemaking authority to FmHA. Congress, by using the language "shall have the power to issue," was committing to the agency the final decision of whether such provisions were necessary and appropriate, and if so, the authority to devise a procedure to implement the provisions.

*Kennedy*, 606 F. Supp. at 1406.**[3]**

In *Prosper Indep. Sch. Dist. v. Colin County Sch. Trs.*, 51 S.W.2d 748 (Tex. Civ. App. 1932), the Texas Court of Civil Appeals held that a state statute providing that "the County Board of Trustees shall have the authority . . . to detach from and annex to any school district territory contiguous to the common boundary line of the two districts" was discretionary, not mandatory:

> Generally, the lodging of authority in any designated board or forum carries with it the right of such board or forum to determine whether a proper case has arisen for the exercise of such power. So, in the instant case, we think the county school board is vested with a discretion to determine whether the power given it by [the statute] shall be exercised in any given case.

*Prosper Indep. Sch. Dist.*, 51 S.W.2d at 751.

The Supreme Court of Tennessee, in *Consumer Advocate Div. v. Greer*, 967 S.W.2d 759 (Tenn. 1998), adopted a similar viewpoint when it held that a state statute providing that the Tennessee Regulatory Authority ("TRA") "shall have the power" to hear and determine whether a public utility rate change is just and reasonable did not impose a mandatory duty on the TRA to convene a contested case hearing upon the filing of a complaint:

> In our view, the clear import of the statutory language, "the authority shall have the power," is that the TRA has the power to convene a contested case hearing if it chooses to exercise the authority. In other words, the language used by the General Assembly implies discretion. Importantly, the statute *does not* say that the TRA "shall hold a hearing" upon the filing of a written complaint. Such language would clearly describe a mandatory duty. Once again, our role is to construe statutes consistently with legislative intent. If the Legislature had intended to mandate a contested hearing upon the filing of a written complaint, it easily could have utilized precise language to accomplish that mandate. Indeed, in other portions of the statutory scheme governing the TRA, the Legislature has employed such mandatory language requiring the TRA to convene a contested hearing. *See e.g.* TENN. CODE ANN. § 65-5-209(c)

---

**[3]**In so concluding, the court noted that procedures incident to an eviction by state judicial process were adequate to protect the rights of the tenant. *Id*. at 1408.

> (1997 Supp.) ("the authority *shall* initiate a contested, evidentiary proceeding to establish initial rates on which the price regulation plan is based") (emphasis added); TENN. CODE ANN. § 65-5-209(d) (1997 Supp.) ("the authority *shall*, upon petition of the competing telecommunications services provider, hold a contested case proceeding.") (emphasis added). The absence of mandatory words in TENN. CODE ANN. § 65-5-203(a), indicates an intentional legislative choice. *State v. Harkins*, 811 S.W.2d 79, 82 (Tenn. 1991).

*Greer*, 967 S.W.2d at 763.

Numerous other courts have likewise recognized the important distinction between the discretionary phrase "shall have the authority/power" and the mandatory directive "shall." *See Pac. Lighting Serv. Co. v. Fed. Power Comm'n*, 518 F.2d 718, 720 (9th Cir. 1975) (holding that a provision of the Natural Gas Act, providing that upon the filing of a new tariff schedule the Federal Power Commission "shall have authority" to hold a hearing on the lawfulness of the rate, makes the holding of hearings discretionary rather than mandatory); *Weller v. United States*, 41 Ct. Cl. 324, 1906 WL 883, at *13 (Ct. Cl. 1906) (holding that 34 U.S.C. § 1061 providing that "the Secretary of the Navy shall have power to convene general courts-martial for the trial of naval cadets" was not mandatory and did not prevent the President from dismissing cadets or midshipmen without trial by court-martial); *Nimmer v. Strickland*, 249 S.E.2d 233, 234 (Ga. 1978) (construing statute providing that the state "shall have authority" to proceed directly against purchasers of portable tobacco-curing barns for unpaid sales tax as permissive and not mandatory); *State v. Beard*, 27 N.E.2d 184, 185-86 (Ohio Ct. App. 1939) (concluding that a statute providing that "the court shall have power to commit the defendant to a local insane hospital" for observation during a sanity determination proceeding conferred discretionary rather than mandatory power to order observation); *State ex rel. Toledo v. Lynch*, 102 N.E. 670, 675 (Ohio 1913) (Wilkin, J., concurring), overruled in part on other grounds, *Village of Perrysburg v. Ridgway*, 140 N.E. 595 (Ohio 1923) (commenting upon a provision in the state constitution and noting that "[o]ne thing is certain. It is not mandatory. By the structure of its language, it is permissive only: 'Municipalities *shall have authority* to exercise all the powers of local self-government.' This is not the equivalent to saying they *must* or *shall* exercise, etc.").

Thus, in the present case, the majority's premise that § 16913(d) "*requires*" – as a condition precedent – that the Attorney General issue regulations regarding SORNA's applicability to pre-SORNA sex offenders before the statute becomes effective as to those offenders is contrary to law and inconsistent with the text of SORNA.

Reading SORNA as a whole, I agree with Judge Shedd who, in his well-reasoned dissent in *United States v. Hatcher*, 560 F.3d 222 (4th Cir. 2009) (Shedd, J., dissenting), concluded that

> it becomes clear that subsection (d) does not exempt the Defendants [sex offenders whose convictions predated SORNA] from SORNA's reach pending a determination by the Attorney General.
>
> Section 16913(a) states in relevant part that "[a] sex offender shall register, and keep the registration current, in each jurisdiction where the offender resides, where the offender is an employee, and where the offender is a student." 42 U.S.C. § 16913(a). SORNA defines a "sex offender" as "an individual who was convicted of a sex offense," *id.* § 16911, and there is no dispute that the Defendants are "sex offenders" within the meaning of § 16913(a) because they were all convicted of sex offenses under state law between 1993 and 2001. Therefore, under the plain terms of § 16913(a), SORNA requires the Defendants to register and keep their registrations current.
>
> Moreover, § 16913(a)'s command is absolute. It contains no exceptions for persons who were convicted of sex offenses before SORNA's enactment. Similarly, § 16913(b) states that all sex offenders "shall initially register," and it contains no exception for sex offenders whose convictions predate SORNA. The same is also true of § 16913(c). It directs sex offenders to keep their registrations current, and makes no distinction between sex offenders who were convicted of sex offenses before or after SORNA's enactment.
>
> Moreover, SORNA "establishes a *comprehensive national* system for the registration" of sex offenders, 42 U.S.C. § 16901 (emphasis added), and numerous other statutory provisions confirm SORNA's "comprehensive" nature. For example, SORNA requires every state to maintain a statewide sex offender registry conforming to SORNA's national requirements. *Id.* § 16912. In other sections, SORNA requires the Attorney General to maintain a "*national* database" "for each sex offender," *id.* § 16919(a) (emphasis added), and a "*National* Sex Offender Public Website," which "shall include relevant information for *each* sex offender," *id.* § 16920 (emphasis added).

In addition, SORNA defines the term "sex offender" as an individual who "*was* convicted of a sex offense." *Id*. § 16911 (emphasis added). By using the verb "was," SORNA expressly sweeps persons who were convicted of sex offenses prior to SORNA's enactment within the statute's scope and thus indicates that the statute is not purely prospective in nature, applying only to persons whose sex offenses postdate SORNA'S enactment.

Therefore, subsection (d)'s context makes it clear that the provision should be read in light of at least three primary guideposts: first, SORNA establishes a "*comprehensive*" system for the registration of sex offenders; second, subsections (a)-(c) require sex offenders to register, without exception; and third, SORNA defines sex offenders as persons who *were* convicted of sex offenses prior to SORNA's enactment. Reading subsection (d) against this backdrop, I conclude that subsection (d) is unambiguous and does not operate to negate SORNA's coverage of all sex offenders – coverage which is established in subsections (a)-(c). Understood in context, subsection (d) merely authorizes the Attorney General to exempt persons with sex offenses that predate July 27, 2006, from SORNA's reach. In other words, the Attorney General could declare that SORNA is inapplicable to certain persons.

Further, there is simply nothing in the word "applicability" itself which suggests any determination by the Attorney General must be prospective only. The language certainly allows the Attorney General to determine that no pre-SORNA sex offenders are exempt and that SORNA *continues* to apply to them. Indeed, that is what the Attorney General did by adopting the Interim Rules. Therefore, unless the Attorney General were to exercise his authority to exempt a sex offender from SORNA's reach, SORNA applies to all sex offenders . . . regardless of the date of their convictions. . . .

560 F.3d at 232-33 (citations and footnotes omitted). *Cf. United States v. Hinckley*, 550 F.3d 926, 929-35 (10th Cir. 2008), *cert. denied*, 129 S. Ct. 2383 (2009); and *United States v. May*, 535 F.3d 912, 916-19 (8th Cir. 2008), *cert. denied*, 129 S. Ct. 2431 (2009) (both cases holding that SORNA applies immediately to sex offenders registered under state law prior to SORNA's enactment and that the Attorney General was authorized under § 16913(d) to create rules applicable only to those sex offenders who were unable to comply with the initial registration requirements of SORNA).

In the interim rule, the Attorney General declared that "[t]he requirements of [SORNA] apply to all sex offenders, including sex offenders convicted of the offense for

which registration is required prior to the enactment of that Act."  28 C.F.R. § 72.3 (2007).  The *May* court stated accurately that "[t]he Attorney General did not believe a rule was even needed to confirm SORNA's applicability to [pre-SORNA registered sex offenders]" but "only promulgated the rule as a precautionary measure" as evidenced by the official statement accompanying the interim rule.  *May*, 535 F.3d at 919 (citing *Applicability of the Sex Offender Registration and Notification Act*, 72 Fed. Reg. 8894, 8896 (February 28, 2007)).  In that statement, the Attorney General explained:

> SORNA directly imposes registration obligations on sex offenders as a matter of federal law and provides for federal enforcement of these obligations under circumstances supporting federal jurisdiction.  These obligations include registration, and keeping the registration current, in each jurisdiction in which a sex offender resides, is an employee, or is a student, with related provisions concerning such matters as the time for registration, the information to be provided by the registrant, and keeping the information up to date.  See 42 U.S.C. 16913-16917, enacted by SORNA §§ 113-17.

> * * *

> As in the Wetterling Act provisions (42 U.S.C. 14071) that preceded SORNA, Congress recognized in SORNA that supplementation of the statutory text by administrative guidance and rules would be helpful, and in some contexts necessary, to fully realize the legislation's objectives. Section 112(b) of SORNA accordingly directs the Attorney General to issue guidelines and regulations to interpret and implement SORNA.  In addition, there are provisions in SORNA that identify specific contexts in which clarification or supplementation of the statutory provisions by the Attorney General is contemplated.

> One of these specific contexts appears in section 113(d) of SORNA, which states that "[t]he Attorney General shall have the authority to specify the applicability of the requirements of this title to sex offenders convicted before the enactment of this Act or its implementation in a particular jurisdiction, and to prescribe rules for the registration of any such sex offenders and for other categories of sex offenders who are unable to comply with subsection (b)."  42 U.S.C. 16913(d).  (The cross-referenced "subsection (b)" states the normal timing rules for initial registration by sex offenders – before release for imprisoned offenders, and within three business days of sentencing for offenders not sentenced to imprisonment.)  Section 113(d) ensures that there will be a means to resolve issues about the scope of SORNA's applicability, including any questions that may arise concerning the retroactive applicability of its

requirements to sex offenders convicted prior to its enactment, and a means to fill any gaps there may be concerning registration procedures or requirements for sex offenders to whom the Act's normal procedures cannot be applied.

* * *

The purpose of this interim rule is not to address the full range of matters that are within the Attorney General's authority under section 113(d), much less to carry out the direction to the Attorney General in section 112(b) to issue guidelines and regulations to interpret and implement SORNA as a whole. The Attorney General will hereafter issue general guidelines to provide guidance and assistance to the states and other covered jurisdictions in implementing SORNA, as was done under the Wetterling Act, see 64 FR 572 (Jan. 5, 1999), and may also issue additional regulations as warranted.

*The current rulemaking serves the narrower, immediately necessary purpose of foreclosing any dispute as to whether SORNA is applicable where the conviction for the predicate sex offense occurred prior to the enactment of SORNA.* This issue is of fundamental importance to the initial operation of SORNA, and to its practical scope for many years, since it determines the applicability of SORNA's requirements to virtually the entire existing sex offender population.

*Considered facially, SORNA requires all sex offenders who were convicted of sex offenses in its registration categories to register in relevant jurisdictions, with no exception for sex offenders whose convictions predate the enactment of SORNA.* . . .

Nevertheless, sex offenders with predicate convictions predating SORNA who do not wish to be subject to the SORNA registration requirements, or who wish to avoid being held to account for having violated those requirements, have not been barred from attempting to devise arguments that SORNA is inapplicable to them, e.g., because a rule confirming SORNA's applicability has not been issued. *This rule forecloses such claims by making it indisputably clear that SORNA applies to all sex offenders (as the Act defines that term) regardless of when they were convicted. The Attorney General exercises his authority under section 113(d) of SORNA to specify this scope of application for SORNA, regardless of whether SORNA would apply with such scope absent this rule, in order to ensure the effective protection of the public from sex offenders through a comprehensive national system for the registration of such offenders.*

72 Fed. Reg. at 8895-96 (emphasis added).

I agree with the Attorney General that the interim regulation was not necessary because SORNA facially applies to sex offenders convicted before July 27, 2006. Absent action by the Attorney General, the general rule of 42 U.S.C. § 16913(a) requires all sex offenders to register and maintain current registration. Because subsection (d) provides an exception to the general rule, the Attorney General was not required to act. Nonetheless, he did so to eliminate any uncertainty or ambiguity.

"It is well established that, absent a clear direction by Congress to the contrary, a law takes effect on the date of its enactment." *Gozlon-Peretz v. United States*, 498 U.S. 395, 404 (1991) (citations omitted). The majority's holding contradicts this rule by establishing an artificial and problematic "gap period" before SORNA becomes effective.

For these reasons, I respectfully dissent from the majority's holding that SORNA's requirements for the registration and updating of registrations by sex offenders convicted before July 27, 2006, were ineffective until the Attorney General acted to promulgate valid regulations. The majority has read language into SORNA which simply does not exist.

Because Cain already was a registered sex offender under existing Ohio law when SORNA was enacted, he was subject to SORNA and required to keep his registration current on and after July 27, 2006. His undisputed failure to comply with SORNA after its effective date thus requires affirmance of the district court's judgment.

IV.

Assuming arguendo that, as the majority posits, SORNA's application to pre-SORNA registered sex offenders was not established until the Attorney General issued his interim rule, I disagree with the majority's additional holding that the Attorney General failed to demonstrate good cause to issue his interim regulations without the thirty-day notice and comment customarily required by the Administrative Procedures Act (the "APA").[4]

Recently, in *United States v. Hernandez*, 615 F. Supp 2d 601 (E.D. Mich. 2009), the district court rejected an identical APA claim involving SORNA after citing the weight of authority on this issue and finding that the "public interest" of safety demonstrated "good cause":

> Defendant further attacks the applicability of the SORNA registration requirements to pre-SORNA convictions by arguing that the Attorney General's Interim Rule, 28 C.F.R. § 72.3, which set forth retroactive registration requirements for pre-SORNA convictions, violated the Administrative Procedures Act ("APA"), 5 U.S.C. § 553. The APA requires that all rules must either comply with a 30-day notice and comment period or have "good cause" to forego the notice and comment period. 5 U.S.C. § 553. The Attorney General did not provide the usual

---

[4] It appears that the majority has reviewed de novo the Attorney General's finding of good cause. Under the APA, our authority to review an agency decision is limited to a determination whether it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). *See generally, Battle Creek Health Sys. v. Leavitt*, 498 F.3d 401, 409 (6th Cir. 2007); *Sasse v. U.S. Dep't of Labor*, 409 F.3d 773, 778 (6th Cir. 2005); *see also Philadelphia Citizens in Action v. Schweiker*, 669 F.2d 877, 886 (3d Cir. 1982) (reviewing the administrative agency's claim that "impracticability"under 5 U.S.C. § 553(b)(B) excused its compliance with the APA's notice and comment requirements under the deferential "arbitrary, capricious, and abuse of discretion" standard of review; stating that "we must not substitute our judgment for that of the agency" but "must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment"; and evaluating the district court's ruling on the issue for "clear error") (citation and internal quotation marks omitted); *United States v. Gavrilovic*, 551 F.2d 1099, 1105-06 (8th Cir. 1977) (stating that, "[i]n reviewing whether the [administrative agency] has met its legal burden of showing that [its forgoing of the APA's notice and comment requirements] was in fact 'necessitated' by the conditions of public health and safety, we do not suggest that this court may substitute its judgment for that of the agency" and "the agency must be given broad leeway in exercising its administrative expertise"). *But see Reno-Sparks Indian Colony v. United States Envtl. Prot. Agency*, 336 F.3d 899, 909 n.11 (9th Cir. 2003) (reviewing de novo agency's decision not to follow the APA's notice and comment procedures "because complying with the notice and comment provisions when required by the APA is not a matter of agency choice.") (citation and internal quotation marks omitted). In my view, because the Attorney General has been granted the authority to decide whether good cause exists, judicial deference should be afforded the decision. However, under either standard of review, good cause has been shown.

30-day notice and comment period for 28 C.F.R. § 72.3, but enacted the Interim Rule effective immediately under the "good cause" exception.

The APA permits agencies to enact rules without the 30-day notice and comment period for "good cause" where "notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest." 5 U.S.C. § 553(b)(3)(B). The Justice Department did comply with the APA requirement of incorporating the finding of good cause and a summary of the good cause justification within the interim rule. *Id.* Specifically, the Justice Department included the following language in the interim rule:

> The immediate effectiveness of this rule is necessary to eliminate any possible uncertainty about the applicability of the Act's requirements – and related means of enforcement, including criminal liability under 18 U.S.C. § 2250 for sex offenders who knowingly fail to register as required – to sex offenders whose predicate convictions predate the enactment of SORNA. Delay in the implementation of this rule would impede the effective registration of such sex offenders and would impair immediate efforts to protect the public from sex offenders who fail to register through prosecution and the imposition of criminal sanctions. The resulting practical dangers include the commission of additional sexual assaults and child sexual abuse or exploitation offenses by sex offenders that could have been prevented had local authorities and the community been aware of their presence, in addition to greater difficulty in apprehending perpetrators who have not been registered and tracked as provided by SORNA. This would thwart the legislative objective of "protect[ing] the public from sex offenders and offenders against children" by establishing "a comprehensive national system for the registration of those offenders," SORNA § 102, because a substantial class of sex offenders could evade the Act's registration requirements and enforcement mechanisms during the pendency of a proposed rule and delay in the effectiveness of a final rule.

SORNA Interim Rule, 72 Fed. Reg. 8894.

Defendant argues that the reasons articulated by the Justice Department are legally insufficient to justify a "good cause" exception to enable the Justice Department to avoid the notice and comment requirement. Citing *Buschmann v. Schweiker*, 676 F.2d 352, 357 (9th Cir. 1982), Defendant

contends that the "good cause" exception is an "emergency procedure" and should only be allowed when "delay would do real harm." Defendant's argument is not supported by the applicable case law.

Numerous courts addressing the merits of APA violation claims have unanimously decided that the SORNA Interim Rule does not violate the APA. *See e.g.*, *United States v. Shenandoah*, 572 F. Supp. 2d 566, 589-90 (M.D. Pa. 2008); *United States v. Vasquez*, 576 F. Supp. 2d 928, 940-41 (N.D. Ill. 2008); *United States v. Torres*, 573 F. Supp. 2d 925, 948-50 (W.D. Tex. 2008); *United States v. Gould*, 526 F. Supp. 2d 538, 546 (D. Md. 2007); *United States v. Keleher*, 2008 WL 5054116, *16-17 (E.D. Cal. 2008); *United States v. Robinson*, 2008 WL 4086474, *9 (S.D. Ga. 2008); *United States v. David, supra*, 2008 WL 2045827 at *8. *See also United States v. Dixon*, 551 F.3d 578, 583 (7th Cir. 2008) (rejecting defendant's claim that SORNA violates the APA out of hand as "a frivolous argument."). The Court joins these courts and finds that the Attorney General's explicit rationale demonstrates good cause for enacting the regulations without notice or comment, namely, to prevent a delay in implementation that could jeopardize the safety of the public and thwart the purposes of the Act.

*Id*. at 612-13.

Likewise, in *United States v. Gould*, 568 F.3d 459, 470 (4th Cir. 2009), the Court of Appeals for the Fourth Circuit held that good cause was demonstrated because delay for notice and comment would "put the public safety at greater risk":

In the circumstances, we conclude that the Attorney General had good cause to invoke the exception to providing the 30-day notice. There was a need for legal certainty about SORNA's "retroactive" application to sex offenders convicted before SORNA and a concern for public safety that these offenders be registered in accordance with SORNA as quickly as possible. Delaying implementation of the regulation to accommodate notice and comment could reasonably be found to put the public safety at greater risk. In addition, the Attorney General did provide for and receive post-promulgation public comments, which were addressed in the proposed National Guidelines issued in May 2007 and ultimately in the final National Guidelines issued in July 2008. *See* 72 Fed. Reg. at 8896 (Feb. 28, 2007); 72 Fed. Reg. 30210 (May 30, 2007); 73 Fed. Reg. 38030 (July 2, 2008).

I agree with the sound rationale of these courts. Significantly, as the *Gould* court points out, the Attorney General complied with the Congressional mandate of § 16912(b) by issuing proposed guidelines for SORNA in May 2007 and, following observance of

the requisite notice and comment of 5 U.S.C. § 553, then issuing final guidelines in July 2008.  *See Proposed Guidelines to Interpret and Implement the Sex Offender Registration and Notification Act*, 72 Fed. Reg. 30210 (May 30, 2007), and *Final Guidelines to Interpret and Implement the Sex Offender Registration and Notification Act*, 73 Fed. Reg. 38030 (July 2, 2008).  The majority has imprudently created an inter-circuit conflict on this issue.

Good cause for the immediate effect of the interim rule is based upon the same public interest concern for safety from convicted sex offenders that led Congress to enact, with immediate effect, the Adam Walsh Child Protection and Safety Act of 2006.  In my view, the Attorney General's finding of good cause in furtherance of the overriding interest of public safety is substantial and compelling.  Good cause to waive the customary notice and comment period has been shown.  Accordingly, the interim regulation is valid and applicable to Cain, even if the majority's erroneous construction of SORNA were accepted.

V.

For these reasons, I respectfully dissent.  I would affirm defendant Cain's conviction.[5]

---

[5]The additional issues raised by Cain are meritless and warrant little discussion.  Cain's Commerce Clause, Ex Post Facto, and other constitutional claims have been rejected by every circuit court that has considered them.  *See Gould*, 568 F.3d at 470-75; *Hinckley*, 550 F.3d at 938-40; and *May*, 535 F.3d at 919-22.  I agree with our sister circuits regarding these issues and adopt their analysis.  Also, the factual defenses Cain raises on appeal pertaining to his conviction are forfeited by his conditional guilty plea.  *See Brady v. United States*, 397 U.S. 742 (1970); *McMann v. Richardson*, 397 U.S. 759 (1970); and *Parker v. North Carolina*, 397 U.S. 790 (1970).